# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 24, 2016          Decided January 24, 2017

No. 12-7139

ACT NOW TO STOP WAR AND END RACISM COALITION AND
MUSLIM AMERICAN SOCIETY FREEDOM FOUNDATION,
APPELLEES

v.

DISTRICT OF COLUMBIA,
APPELLANT

---

Consolidated with 12-7140

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:07-cv-01495)

---

*Carl J. Schifferle*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellant/cross-appellee. With him on the briefs were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

*Mara E. Verheyden-Hilliard* argued the cause for appellees/cross-appellants. With her on the briefs were *Carl L. Messineo* and *Andrea Costello*.

Before: ROGERS and PILLARD, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

PILLARD, *Circuit Judge*: Like many municipalities around the country, the District of Columbia regulates the manner in which members of the public may post signs on the District's lampposts. District of Columbia law allows a posted sign to remain on a public lamppost for up to 180 days. But a sign relating to an event must be removed within 30 days after the event, whether the 180-day period has expired or not. Thus, the District's rule may in some cases give less favorable treatment to signs that relate to an event than to signs that do not.

Two nonprofit organizations, the Act Now to Stop War and End Racism Coalition (ANSWER) and the Muslim American Society Freedom Foundation (MASF) (together, the organizations), challenge the District's sign-posting rule. MASF brings a pre-enforcement challenge to the rule as unconstitutional on its face in violation of the First Amendment and due process. MASF first argues that the distinction between event-related and other signs is content based yet cannot meet strict First Amendment scrutiny and that, even if the rule is not content based, it fails the intermediate scrutiny applicable to content-neutral time, place, and manner restrictions. Second, MASF contends that the regulation delegates an impermissible degree of enforcement discretion to the District's inspectors in violation of due process. It further challenges what it contends is strict liability on the originators of posters for any violation of the sign-posting rule, which MASF argues also contravenes its speech and due process rights. ANSWER, unlike MASF, was cited by the District for violations of the regulation. ANSWER seeks damages under section 1983, contending that

it did not in fact violate the regulation and that citations were unconstitutional retaliation against it for its postering.

The district court granted summary judgment to MASF, invalidating the regulation's treatment of event-related posters on both First Amendment and due process grounds, but rejecting MASF's strict-liability objection. The court also sanctioned the District for seeking discovery in the face of an order granting limited discovery to plaintiffs. The district court granted summary judgment to the District on ANSWER's section 1983 damages claim for lack of a showing of a policy, custom, or practice of retaliatory enforcement, as required by *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The District and the organizations cross-appealed.

We conclude that the regulation does not impose a content-based distinction because it regulates how long people may maintain event-related signs on public lampposts, not the content of the signs' messages. The "event-related" category is not itself content based. Under the intermediate First Amendment scrutiny that is therefore applicable, the rule is a reasonable time, place, and manner restriction. It is narrowly tailored to further a well-established, admittedly significant governmental interest in avoiding visual clutter. The regulation's definition of event-based signs also guides officials' enforcement discretion sufficiently to avoid facial invalidation on due process grounds. Accordingly, we reverse the grant of summary judgment in MASF's favor and remand for the district court to enter summary judgment for the District.

On the organizations' cross-appeal, we affirm the district court's dismissal of ANSWER's section 1983 damages claim that the District retaliated against it in violation of the First

Amendment, and MASF's claim that the District's regulation imposes a system of strict liability the First Amendment does not allow. Finally, because discovery is presumptively available to all parties pursuant to the Federal Rules of Civil Procedure in the absence of a court order to the contrary, we vacate the district court's imposition of discovery sanctions against the District for seeking discovery without leave of court.

## I. Background

The District of Columbia began its regulation of signs on public lampposts with an outright prohibition in 1902. D.C. Police Regulations, Art. XII, § 2 (1902). The District partially relaxed that ban in 1958 to allow for the posting of signs on lampposts only with the permission of the District's Commissioners. D.C. Police Regulations, Art. 20 § 2 (1958). After the District's Corporation Counsel advised that the regulation might be constitutionally infirm for lack of clearly articulated standards, *see* Letter from Louis P. Robbins, Acting Corporation Counsel, to James W. Hill, Director, Dep't of Licenses, Investigations, and Inspections (October 12, 1978) (Gov't Add. 13) [hereinafter Robbins Letter], the District revised the regulation to add specific criteria to limit enforcing officers' discretion, *see* Street Sign Regulation Amendment Act of 1979, D.C. Law 3-50, 26 D.C. Reg. 2733 (1979); *see also* Crime Prevention Sign Posting Act of 1980, D.C. Law 3-148, 27 D.C. Reg. 4884. Following the revisions, signs "not relate[d] to the sale of goods" could be affixed to lampposts for up to 60 days; election signs for District of Columbia candidates for public office were exempt from that overall limit but had to be taken down within 30 days after the election; and signs intended to aid neighborhood crime prevention were exempted from the time limits. *See* D.C. MUN. REGS. tit. 24 § 108.4-108.6 (1980). Commercial signs

could not be affixed to public lampposts at all. *See id.* § 108.4. The revised rule also articulated specific requirements for the manner in which signs could be posted on a lamppost "or appurtenances of a lamppost" to "minimiz[e] the need to repair lamp posts defaced by signs attached by adhesives or other permanent methods and the need to remove abandoned or improperly secured signs from lamp posts, the sidewalks and the streets." Robbins Letter at 2; *see* D.C. MUN. REGS. tit. 24, § 108.8-108.9 (1980). During the pendency of this case, the District twice further amended its lamppost rules, as described below.

In the meantime, ANSWER, a "grassroots civil rights organization" that works to end war and oppose racism, Affidavit of Brian Becker ¶ 2 (Mar. 14, 2008), J.A. at 32, had posted signs advertising rallies in the District, including events in September 2007 and March 2010. MASF, an unincorporated nonprofit association that conducts "civil and human rights advocacy with a focus on empowering the Muslim American community," Affidavit of Imam Mahdi Bray (Oct. 26, 2013) ¶ 6, Organizations' Add. 2, has in the past and intends in the future to post signs that combine general messages of advocacy and references to specific events, *see id.* at 6-8. MASF "has sought to engage in postering to the same extent as is afforded others, including those favored within the District of Columbia municipal regulation system." *Id.* at 9. The District of Columbia has not cited MASF, but in 2007 the District issued multiple citations against ANSWER under the then-current lamppost rule.

ANSWER and MASF sued the District, seeking a declaratory judgment that the District of Columbia's lamppost rule violates their First Amendment and due process rights, and an injunction barring its enforcement. First Amended

Complaint, *Act Now To Stop War & End Racism Coal. v. District of Columbia* (*ANSWER I*), 570 F. Supp. 2d 72 (D.D.C. 2008) (No. 07-1495). The district court dismissed both ANSWER's and MASF's claims for lack of standing, and in abstention from pending local administrative enforcement proceedings. *ANSWER I*, 570 F. Supp. 2d at 75-78. The organizations appealed.

This court reversed in part and remanded. *Act Now to Stop War & End Racism Coal. v. District of Columbia* (*ANSWER II*), 589 F.3d 433, 434 (D.C. Cir. 2009). The court held that MASF had standing based on "a credible statement of intent to engage in violative conduct," and had shown sufficient likelihood of enforcement against it because its allegations raised "somewhat more than the 'conventional background expectation that the government will enforce the law.'" *Id.* at 435 (quoting *Seegars v. Gonzales*, 396 F.3d 1248, 1253 (D.C. Cir. 2005)). At the motion to dismiss stage, the court reasoned, an affidavit from MASF's director stating an intention to violate the regulation sufficed to establish standing. *Id.* at 436. As to ANSWER, the court found that the district court had correctly abstained under *Younger v. Harris*, 401 U.S. 37 (1971), to the extent that charges against ANSWER for violations of the challenged regulation remained pending in the District of Columbia's administrative process. *ANSWER II*, 589 F.3d at 436.

While MASF and ANSWER's appeal was pending before this court, the District of Columbia Department of Transportation amended the lamppost regulation. The 2010 final rule made one distinction relevant to the plaintiffs' claims: Signs "not related to a specific event" could be posted for up to 60 days while signs "related to a specific event" could be posted at any time beforehand, but had to be removed within 30 days after the event. 57 D.C. Reg. 528

(January 8, 2010) (amending D.C. MUN. REGS. tit. 24, §§ 108.5 & 108.6). Thus, in theory, event-related signs could be posted for months or years before the event they announced and for an additional 30 days thereafter, while signs that were not event related could be posted for a maximum of 60 days.

On remand, ANSWER voluntarily dismissed its claims for prospective relief. *See* Stipulation of Dismissal, *Act Now To Stop War & End Racism Coal. v. District of Columbia* (*ANSWER III*), 798 F. Supp. 2d 134 (D.D.C. 2011) (No. 07-1495). MASF, the only party still challenging the constitutionality of the District's regulation going forward, amended its complaint in light of the revised rule, adding an as-applied challenge to the "event-related" distinction as content based. *See* Supplemental Pleading ¶¶ 16-17, *ANSWER III*, 798 F. Supp. 2d 134 (No. 07-1495). Because neither the earlier nor the revised regulation had been enforced against MASF, the district court dismissed MASF's as-applied challenge, leaving only its facial challenges under the First Amendment and the Due Process Clause. *ANSWER III*, 798 F. Supp. 2d at 143. Those claims, the court held, could proceed to discovery. *Id.* at 150-51.

Meanwhile, in its supplemental pleading after remand, ANSWER alleged that the District had "attacked" it with ninety-nine enforcement actions in March and April 2010 in retaliation for the content of its postering activity. The court dismissed that claim, holding that ANSWER had failed adequately to allege that the claimed retaliation resulted from a municipal custom or practice. *ANSWER III*, 798 F. Supp. 2d at 154-55. The court also dismissed MASF's claim that the regulation imposes a system of "strict liability" in violation of the First Amendment. *Id*. at 153.

In 2012, the District revised the regulation once more, yielding the version now before us. *See* 59 D.C. Reg. 273 (Jan. 20, 2012). Section 108 currently provides that any sign—including those announcing events—may be affixed to a publicly owned lamppost for a maximum of 180 days, but that signs relating to specific events must be removed within 30 days after the event. D.C. MUN. REGS. tit. 24, §§ 108.5, 108.6. The regulation also continues to restrict the method of affixing signs on public lampposts: All signs must be "affixed securely to avoid being torn or disengaged by normal weather conditions," *id*. § 108.8, but cannot "be affixed by adhesives that prevent their complete removal from the fixture, or that do damage to the fixture," *id*. § 108.9. Signs may not be posted on "any tree in public space," *id*. § 108.2, and no more than three copies of any sign may be posted on either side of the street on a given block, *id*. § 108.10. The 2012 revision also added subsection 108.13, which defines an "event" as "an occurrence, happening, activity or series of activities, specific to an identifiable time and place, if referenced on the poster itself or reasonably determined from all circumstances by the inspector." *See* 59 D.C. Reg. 273 (codified at D.C. MUN. REGS. tit. 24, § 108.13).

After discovery—which we discuss in Part II.E., *infra*, in connection with the sanctions order—the District and MASF cross-moved for summary judgment. The court granted summary judgment to MASF, reasoning that even if the regulation does not distinguish on the basis of content, subsections 108.5 and 108.6 nevertheless fail intermediate scrutiny under the First Amendment for want of admissible evidence showing how the regulation advances the city's content-neutral purposes. *Act Now to Stop War & End Racism Coal. v. District of Columbia* (*ANSWER IV*), 905 F. Supp. 2d 317, 340-41 (D.D.C. 2012). It also held that subsection 108.13 was an impermissible delegation of

enforcement discretion in violation of the Due Process Clause. *Id.* at 332. The court sanctioned the District for seeking discovery in violation of the court's scheduling order. *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 286 F.R.D. 117 (D.D.C. 2012). The District and the organizations cross-appealed.

We held these appeals in abeyance pending the Supreme Court's resolution of *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), *see* Order, *Act Now to Stop War & End Racism Coal. v. District of Columbia*, No. 12-7139 (D.C. Cir. August 20, 2014), and, once *Reed* was decided, requested supplemental briefing addressing its applicability here.

## II. Analysis

We begin by addressing the District's contention that MASF lacks standing to sue. Finding standing, we proceed to MASF's First Amendment and due process facial challenges. As to both, we find MASF's challenges fall short, and accordingly reverse the district court's grant of summary judgment in its favor. We affirm the court's dismissal of ANSWER's section 1983 claim for damages and MASF's claim that the District's rule imposes strict liability in violation of the First Amendment. Finally, we vacate the discovery sanctions again the District.

### A. MASF Has Standing to Challenge the District's Lamppost Regulation

The District argues that MASF ceased operating in 2011, so has "lost standing" during the pendency of its suit. Gov't Br. at 19. Even if MASF exists, the District asserts, it has failed to establish that the regulation causes it to suffer injury in fact. We disagree: An affidavit from MASF's Imam Bray attests that MASF continues to exist as an unincorporated

nonprofit association, and the District's submissions raise no real question on that point.

**1.** ***Evidence Shows MASF Exists.*** For a federal court to exercise jurisdiction, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiff must support standing "with the manner and degree of evidence required at the successive stages of the litigation"). Thus, "[e]ven where litigation poses a live controversy when filed, we must dismiss a case as moot if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Chamber of Commerce of U.S. v. E.P.A.*, 642 F.3d 192, 199 (D.C. Cir. 2011) (alteration in original) (internal quotation marks omitted). The District contends that this case has become moot because MASF no longer exists, thus eliminating it as a party whose rights could be affected.

MASF, as the party invoking our jurisdiction, "bears the burden of establishing" its standing, *Lujan*, 504 U.S. at 561, a burden that is "correlative to the burden" to establish the substantive elements of its claims, *Sierra Club v. E.P.A.*, 292 F.3d 895, 900 (D.C. Cir. 2002). Even though the District did not challenge MASF's existence when it moved for summary judgment because it learned of the evidence that it believes calls MASF's existence into question only after noticing its appeal, we consider MASF's standing *de novo*, as we would had it been challenged at the procedural stage to which the case had progressed in the district court. *Scenic America, Inc. v. Anthony Foxx*, 836 F.3d 42, 49-50 (D.C. Cir. 2016). Accordingly, on appeal from denial of summary judgment in MASF's favor, there must be no material dispute about the

facts that support its standing. We view the evidence and inferences therefrom in the light most favorable to the District as the nonmoving party on MASF's cross-motion for summary judgment. *See Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002).

Imam Bray's affidavit suffices as an authoritative statement of MASF's continued existence as an unincorporated nonprofit association under District of Columbia law. An "unincorporated nonprofit association" is "an unincorporated organization, consisting of 2 or more members joined under an agreement that is oral, in a record, or implied from conduct, for one or more common, nonprofit purposes." D.C. Code § 29-1102(5) (2016). Such a nonprofit is "a legal entity distinct from its members and managers" and has "perpetual duration" unless otherwise provided. *Id.* § 29-1105(a), (b). To operate as an unincorporated nonprofit association an organization need not be registered with the District, *see id.* § 29-1102(5), and it has the capacity on a member or manager's initiative to sue in its own name, *id.* § 29-1109.

In his affidavit, Imam Bray attested that, "[t]hroughout the period of litigation, there have always been two or more persons (*i.e.* 'members' as that term is used in the District's Uniform Unincorporated Nonprofit Association Act) who have participated in the management of the affairs of MASF or in the development of the policies and activities of MASF." Bray Affidavit ¶ 4, Organizations' Add. 2. The District has no evidence that the organization in fact lacks "2 or more members," D.C. Code § 29-1102(5), who have joined together for a "common, nonprofit purpose," *id.*, namely "to engage in civil and human rights advocacy with a focus on empowering the Muslim American community," Bray Affidavit ¶ 6, Organizations' Add. 2.

The District challenges MASF's existence based on an online newspaper report and a record from the District of Columbia Department of Consumer and Regulatory Affairs. While this appeal was pending, the District learned of an online *Muslim Link* article reporting that MASF "announced its closure on June 17, 2011." Gov't Add. 40. The *Link* cited a statement from someone identifying himself as a MASF member that the organization did not have "the resources that would allow [continuing] advocacy and organizing work." *Id.* (alterations in original). In the online "comments" section of the document as printed and filed by the District, however, a member of the Muslim American Society's Board of Trustees, Mazan Mokhtar, explained that the "reports of MAS Freedom's closing are greatly exaggerated." Gov't Add. 42. Imam Bray's declarations attest to MASF's continued existence. Bray Affidavit ¶¶ 10-29, Organizations' Add. 3-9. The conclusory and ambiguous *Link* document, unaccompanied by a declaration of the quoted individual or anyone else attesting to personal knowledge of the putative closing, fails to call into question MASF's continued existence.

The District also points to a record from the District of Columbia Department of Consumer and Regulatory Affairs (DCRA) stating that an entity referred to as "MASF, Inc.," had its incorporation status "revoked." *See* Gov't Br. Add. 44. MASF, however, avers that it is not the organization described in that DCRA record. MASF's complaint does not refer to the organization as "MASF, Inc.," *see* First Amended Complaint at 5, *ANSWER I*, 570 F. Supp. 2d 72 (No. 07-1495), nor is it so described in the corporate disclosure statement to this court, *see* Corporate Disclosure Statement, Docketed February 28, 2013. For further confirmation, MASF points to Imam Bray's sworn affidavit attesting that MASF has never been incorporated. *See* Bray Affidavit,

Organizations' Add. 2-3. Imam Bray explains that he "was involved with the formation and abandonment of that short-lived separate corporation. Those papers were filed with the intent to create a 501(c)(4) corporation that would engage in activities coinciding with the 2008 Presidential election. However, the project was abandoned. The incorporation papers were, essentially, a false start." *Id*. at 3. Thus, the District has not raised a material factual dispute as to whether the organization whose incorporation is listed as "revoked" is the party before us.

Neither of the District's submissions suffices to call into question MASF's continued existence.

**2.** *MASF Has Established its Injury***.** The District also contends that, even if MASF exists, the lamppost regulation causes it no injury.

MASF brings a pre-enforcement challenge to the regulation before it has faced any punishment. As we explained when this case was previously before us, "standing to challenge laws burdening expressive rights" may require "only 'a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law.'" *ANSWER II*, 589 F.3d at 435 (quoting *Seegars v. Gonzales,* 396 F.3d 1248, 1253 (D.C. Cir. 2005)). Here, MASF encounters "somewhat more than the 'conventional background expectation that the government will enforce the law.'" *Id.* (quoting *Seegars*, 396 F.3d at 1253). Given the District's energetic issuance of multiple citations against ANSWER, the threat of enforcement against MASF is not "imagined or wholly speculative," *Seegars*, 396 F.3d at 1252, nor is there reason to think "the challenged law is rarely if ever enforced," *id.*

The District now argues that the 2012 amendment of the lamppost regulation during the pendency of this case has eliminated the risk of harm that MASF identified. The District says that MASF has "never asserted an intent to poster in violation of the regulations invalidated on summary judgment"—*i.e.*, the current rule, as promulgated in 2012. Gov't Br. at 27. MASF's only claimed injury, the District contends, stems from the disfavored status afforded to signs *not* related to an event under the superseded 2010 Regulation—a disadvantage the current regulation eliminates.

The 2010 rule favored signs related to an event but, in eliminating that leeway, the 2012 version could be viewed to have swung too far in the other direction so as to disfavor event-related signs. *See* 59 D.C. Reg. 273 (2012). Under the 2010 rule, signs "not related to a specific event" could be posted for up to 60 days; the rule did not specify how far in advance signs "related to a specific event" might be posted, so long as they were removed within 30 days of the event. 57 D.C. Reg. 528 (Jan. 8, 2010). Thus, the 2010 rule on its face allowed event-related signs to remain on lampposts for months or years leading up to an event, while it restricted total posting time for signs not related to an event. Under the current rule as amended in 2012, however, no sign—whether or not related to an event—may remain affixed to a public lamppost for more than 180 days. D.C. MUN. REGS. tit. 24, § 108.5 (2012). Signs relating to a specific event must, as before, be removed within 30 days after the event. *Id.* § 108.6. The current rule thus treats event-related signs, in some circumstances, less favorably than signs unrelated to any event: Assuming an event-related sign is posted fewer than 150 days before the event, the requirement that it be removed within 30 days after the event means it may not be displayed for the full 180-day period it would otherwise enjoy under the regulation if it were unrelated to an event.

The District notes that MASF filed its amended complaint on the heels of the 2010 rule, and contends that the Complaint expressed only MASF's intent to violate the then-comparatively-restrictive 60-day limit that the 2010 rule imposed on signs not related to an event. But MASF's intent is not so narrowly circumscribed: It intends to "engage in postering to the same extent as is afforded others." Bray Affidavit ¶ 32, Organizations' Add. 9. The organization has reasserted, since the rule revision in 2012, that it plans to post signs that would "violate the challenged regulations, specifically keeping them affixed for 180 days despite the regulations requiring any poster that is 'related to a specific event' to be removed 30 days post-event." *Id*. ¶ 35. MASF also intends to post signs that contain both information related to events and information of continuing relevance and expresses uncertainty as to whether such signs are subject to the 30-day post-event limitation. *See id*. ¶ 37. The District's arguments that MASF lacks standing therefore fail.

## B. The District's Rule Does Not Violate the First Amendment

The District's regulation of the public's use of city lampposts as convenient places to post signs is a content-neutral time, place, and manner restriction that is sufficiently tailored to a significant governmental interest in avoiding clutter to comport with the First Amendment. As the district court held, "the District's lampposts are a textbook example of a limited or designated public forum." *ANSWER III*, 798 F. Supp. 2d at 145. The District might have chosen not to make its lampposts available as a place for the people to put up their signs. *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 814-15 (1984). But once it allows members of the public to post signs on its lampposts, the government lacks the "power to restrict expression because of its message,

its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

The level of constitutional scrutiny is determinative here. MASF contends that the lamppost rule is content-based so subject to strict scrutiny under *Reed v. Town of Gilbert*, whereas the District of Columbia says the rule is a content-neutral time, place, and manner restriction quite different from the content-based sign-posting regulations struck down in *Reed*. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed,* 135 S. Ct. at 2226. Government may, however, impose content-neutral limitations on the duration and manner in which the public uses government property for expressive conduct like sign-posting. "'[C]ontent-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986).

We review *de novo* the district court's grant of summary judgment to the organizations on their First Amendment claim. *Hodge v. Talkin*, 799 F.3d 1145, 1155 (D.C. Cir. 2015).

**1.** *The Rule Is Content Neutral.* The District of Columbia's lamppost rule makes a content-neutral distinction between event-related signs and those not related to an event. The District requires that, whatever their content or viewpoint, event-related signs be removed within thirty days after the event to prevent them from accumulating as visual clutter. That rule is not a "regulation of speech," but "a

regulation of the places where some speech may occur." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). It does not target the "communicative content" of those signs, such as by distinguishing among various events by topic, *see Reed*, 135 S. Ct. at 2226-27, but uniformly restricts the duration that event notices may remain physically affixed to public lampposts. The rule's clutter-minimizing rationale does not depend on the content of a sign's message. *See Hill*, 530 U.S. at 723; *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

Content distinctions are of special concern under the First Amendment because they pose the risk that government is favoring particular viewpoints or subjects. But a broad-based, general distinction between event-based signs and other signs poses no such risk. It instead simply reflects the common-sense understanding that, once an event has passed, signs advertising it serve little purpose and contribute to visual clutter. The promulgation and function of the District of Columbia's wholly viewpoint neutral lamppost rule reveals "not even a hint of bias or censorship." *Taxpayers for Vincent*, 466 U.S. at 804.

The fact that District officials may look at what a poster says to determine whether it is "event-related" does not render the District's lamppost rule content-based. The "event-related" definition is just as content neutral as was Colorado's "free zone" sustained in *Hill*, which prevented persons approaching patients on the sidewalk outside abortion clinics to come closer than eight feet to engage "in 'oral protest, education, or counseling' rather than pure social or random conversation." 530 U.S. at 721. The Court in *Hill* acknowledged that "the content of the oral statements made by an approaching speaker must sometimes be examined to determine whether the knowing approach is covered by the statute," but noted that such "cursory examination" did not

render the statute facially content based. *Id*. at 720, 722. So, too, laws banning "picketing," and injunctions aimed at "demonstrating" that do not bar other types of expressive conduct are not rendered content based merely because, at a general level, the character of the expressive activity must be taken into account to discern whether the law applies. *See id.* at 722-23 & n.30 (citing *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 366-67 n.3 (1997); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 759 (1994); *Frisby v. Schultz*, 487 U.S. 474 (1988); *United States v. Grace*, 461 U.S. 171 181 n.10 (1983); *Police Dept. of Chicago v. Mosley*, 408 U.S. at 98). So, too, the fact that a District of Columbia official might read a date and place on a sign to determine that it relates to a bygone demonstration, school auction, or church fundraiser does not make the District's lamppost regulation content based.

MASF contends that *Reed* requires us to apply strict scrutiny because "[t]he regulation singles out specific subject matter—that deemed 'related to a specific event'—for differential treatment," and that, per *Reed*, there is no "exception from the content-neutrality requirement for event-based laws." Cross-Appellants' Supp. Br. at 6 (quoting *Reed*, 135 S. Ct. at 2231). But *Reed* does not view a bare distinction between event-related and other signs as itself content-based. The aspect of the Sign Code invalidated in *Reed* that the Court held to be content-based was its further distinctions among signs—including among event-related signs—based on their subject matter.

The Town of Gilbert's complex Sign Code exempted twenty-three categories of signs—based on their content—from the town's general ban on posting outdoor signs, and made additional content distinctions among the categories of exempted signs, including several content distinctions among

event-related signs. 135 S. Ct. at 2224-25. In particular, the Sign Code gave different amounts of leeway to event-related signs depending on whether the event was, for example, political, commercial, construction-related, "special-event," or religious or charitable. Political signs, including any "temporary sign designed to influence the outcome of an election called by a public body," *id.* (quoting Gilbert, Ariz., Land Development Code (Sign Code or Code), Glossary of General Terms, at 23 (2005)), enjoyed relatively generous time limits; they could be posted for up to sixty days before a primary election, and, if the candidate to which they referred advanced to the general election, they could remain posted until fifteen days following the general election, *id.* at 2225. Signs relating to Temporary Uses and Special Events could be posted up to 24 hours in advance and remain posted through the day of the event, whereas Garage Sale signs and Bazaar signs could remain posted only until the "end of the sale." Gilbert, Ariz., Land Development Code, Art. 4.402(K), (O), (Y). The Gilbert Sign Code permitted builders to post weekend directional signs "no earlier than 4:00 p.m. on Friday of each week" and had to remove them "no later than 8:00 a.m. on the following Monday." *Id*. Art. 4.405(B)(2)(f).

The Town of Gilbert's Sign Code gave least favorable treatment to the kind of sign that the petitioner church in *Reed* sought to use: "Temporary Directional Signs Relating to a Qualifying Event." 135 S.Ct. at 2225. Such a sign, defined as one that directed people to any "assembly, gathering, activity, or meeting sponsored, arranged, or promoted by a religious, charitable, community service, educational, or other similar non-profit organization," could only be displayed for twelve hours before the event, and had to be removed within an hour after the event. *Id*. The Sign Code thus afforded more leeway to electioneering signs and even signs relating to specified Temporary Uses such as farmers' markets or

fireworks displays than to signs for morning church services, which for the most part could not go up until after dark in winter, and had to be removed the next morning before coffee and doughnuts were fully digested.

The rule the organizations here challenge, in contrast, distinguishes only between signs that are event-related and signs that are not. That distinction is not itself content-based under *Reed*. The organizations assert that *Reed* held that the "event-based" category is necessarily content-based because it "singles out specific subject matter—that deemed 'related to a specific event'—for differential treatment." Appellee Supp. Br. at 6. But *Reed* did not so hold. The passage the organizations invoke was directed at the notion the court of appeals had advanced that an otherwise "obvious content-based inquiry," such as the distinction between "political" and "ideological" signs relating to an upcoming election, would be somehow rendered content-neutral and thereby "evade strict scrutiny review simply because an event (*i.e.* an election) is involved." *Reed*, 135 S. Ct. at 2231.

Indeed, *Reed* makes clear that a municipality may continue to treat event-related signs differently from non-event-related signs by means of time, place, and manner restrictions, as long as it does not distinguish among types of event based on content. What *Reed* held constitutionally suspect was the way in which the Town of Gilbert's Sign Code made content-based distinctions among different types of issues and events, and even different types of signs relating to the same event. *See Reed*, 135 S Ct. at 2227. Unlike the content-based treatment of event-related signs invalidated in *Reed*, District of Columbia law treats all event-related signs alike and is thus content neutral.

The Court in *Reed* emphasized that differences in time limits depending on the "communicative content" of the signs was what subjected the Town of Gilbert Sign Code to strict scrutiny. *See id.* at 2227. Because Gilbert's Sign Code treated "the Church's signs inviting people to attend its worship services . . . differently from signs conveying other types of ideas," it was content-based regulation. *Id.* The Court emphasized that the Sign Code's distinctions did not merely "hinge on 'whether and when an event is occurring,'" and did not just "permit citizens to post signs on any topic whatsoever within a set period leading up to an election." *Id*. at 2231. Rather, the Code impermissibly required town officials to examine each sign to determine whether, for example, it was "designed to influence the outcome of the election" and so must come down within fifteen days thereafter, or more generally "ideological," in which case no time limit applied. *Id*. at 2231.

Justice Alito's concurring opinion in *Reed* even more squarely rejects the position the organizations advance here that the distinction between event-related and other signs is itself content-based. Writing for three of the six justices in the majority, Justice Alito specifies that a regulation "imposing time restrictions on signs advertising a one-time event" does not by token of the "event-related" category as such amount to a content-based distinction. *Id*. at 2233 (Alito, J., concurring). Rules treating event-related signs as a group differently based on their time-limited nature "do not discriminate based on topic or subject and are akin to rules restricting the times within which oral speech or music is allowed." *Id.* That is, such rules are time, place, or manner restrictions, constitutionally permissible if they are narrowly tailored to serve a significant governmental interest. The three justices who concurred in *Reed* also clearly would not strictly scrutinize the rule we face here. *See id*. at 2236

(Breyer, J., concurring in the judgment) (concluding that even the regulation at issue there "does not warrant 'strict scrutiny'"); *id*. at 2236-38 (Kagan, J., joined by Ginsburg and Breyer, JJ., concurring in the judgment) ("The absence of any sensible basis for these and other distinctions dooms the Town's ordinance under even the intermediate scrutiny that the Court typically applies to 'time, place, or manner' speech regulations. Accordingly, there is no need to decide in this case whether strict scrutiny applies to every sign ordinance in every town across this country containing a subject-matter exemption.").

All four of the opinions in *Reed* confirm that the District of Columbia's lamppost rule is not a content-based regulation of speech. The District's rule governs the time event-related signs may remain on public lampposts after the event has passed because obsolete signs cause a particular aesthetic harm; the rule makes no distinctions among event-related signs based on their particular communicative content. *Reed*'s definition of content-based regulation does not sweep in rules like the District's that merely distinguish between all signs related to events and all non-event-related signs. It is therefore not subject to the strict scrutiny applicable to content-based regulation of speech, but must only meet the lesser constitutional scrutiny applicable to content-neutral rules affecting speech.

Accordingly, we proceed to consider the validity of the regulation under the standard applicable to content-neutral regulation of speech.

**2.** ***The Regulation Withstands Intermediate Scrutiny.*** Even if the regulation is content neutral, MASF argues, it nevertheless violates the First Amendment. The district court granted partial summary judgment to MASF on the ground

that the regulation could not pass muster under the intermediate scrutiny applicable to content-neutral regulation of speech.

A basic principle of the First Amendment—that "[e]ven protected speech is not equally permissible in all places and at all times," *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985)—permits the government to impose "reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *United States v. Grace*, 461 U.S. 171, 177 (1983) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)); *see Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 n.8 (1984). Those same standards apply whether the regulated speech occurs in a traditional public forum—*i.e.* streets and parks—or on public property that the government has designated for the public's use as a forum for speech and other expressive conduct, such as the lampposts in this case. *Perry Educ. Ass'n*, 460 U.S. at 45-46. It is the District of Columbia's burden to show that its regulation serves a substantial governmental purpose and is tailored to that purpose. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014); *Edwards v. District of Columbia*, 755 F.3d 996, 1002-03 (D.C. Cir. 2014). We conclude that it meets that burden here.

The District's interest is plainly significant. "[M]unicipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression." *Taxpayers for Vincent*, 466 U.S. at 806; *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981) (finding no "substantial doubt" that the governmental objective of furthering "the appearance of the city" is a

"substantial governmental goal[]"); *Mahoney v. Doe*, 642 F.3d 1112, 1118 (D.C. Cir. 2011). The district court accepted that the prevention of clutter and litter is a substantial interest, *see ANSWER IV*, 905 F. Supp. 2d at 334 n.4, and MASF does not challenge that conclusion here, *see* Organizations' Br. 44.

Instead, MASF argues that the District of Columbia has failed to show that its regulation actually serves that interest. But the event-related distinction in the District's regulation turns on the very non-speech feature of that activity that makes it proscribable in the first place—that is, the visual blight of superannuated event signs. The District distinguishes event-related from non-event-related signs based on its "weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression." *Taxpayers for Vincent*, 466 U.S. at 806. The District's reasoning is straightforward: All signs have both communicative value and aesthetic costs. Leading up to an event, the communicative value of a sign related to that event outweighs the aesthetic harm that sign causes. But after the event, the communicative value of the sign is greatly diminished. The sign then becomes, from the District's perspective, little more than visual clutter. *See* Robbins Letter at 2. There is also greater risk that an event-related sign will be abandoned after the event it announces, and not maintained like a sign with continuing relevance. Failure to remove such a sign is itself a manifestation of neglect.

As the Supreme Court has explained, where the basis for distinguishing between types of communicative conduct "consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). Such is the case here. That is not to say that an event-related sign loses all communicative

value after the event has occurred. A viewer might have some interest, for example, in knowing what kinds of events had taken place (or been advertised) in the neighborhood in the past, even though she had missed the event itself. That an event-related sign might have some residual continuing relevance, however, does not bar the District from determining, in a content-neutral, across-the-board manner, that the visual clutter outweighs any such interest.

The district court held that the District, "by submitting no evidence whatsoever" of the relationship between its admittedly substantial interest and the challenged regulation, had failed to meet its burden on summary judgment. *ANSWER IV*, 905 F. Supp. 2d at 344. The District responds that it has sought, since it first established criteria for permitting the public to post signs on District lampposts, to protect "legitimate governmental interests in caring for city lampposts and neighborhood aesthetics while contemporaneously affording citizens ample opportunity to exercise their First Amendment rights." D.C. Council, Report on Bill 3-179, at 3 (Sept. 26, 1979). The District was not required in these circumstances to submit studies, statistics or other empirical evidence in order to defend the event-related distinction as a narrowly tailored means to serve its substantial aesthetic interest. That relationship is less a matter to be established by empirical evidence than it is the result of a straightforward line of reasoning: "A poster for an event that has already occurred is more likely to constitute litter and blight than a poster for a future event" or a non-event-related sign. *ANSWER III*, 798 F. Supp. 2d at 148. As the Supreme Court has observed, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391 (2000).

The District's aesthetic judgment that an event-related sign for an event that has passed contributes to visual clutter is utterly plausible and not novel. *See Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 16 (D.C. Cir. 2009) (explaining that because "a value judgment based on the common sense of the people's representatives" is not like a justification based on "economic analysis that [is] susceptible to empirical evidence," such a common-sense judgment need not be supported by an evidentiary showing); *see also Blount v. S.E.C.*, 61 F.3d 938, 944-45 (D.C. Cir. 1995) (holding that there is no need to show evidence of any specific quid pro quo to support the regulation against First Amendment challenge because the dynamic to which regulation responded was "self-evident[]"). The justification for the rule's requirement that event-related signs be removed within thirty days of the event is just the sort of common-sense judgment for which empirical data is likely to be both unavailable and unnecessary.

The District has also shown that its lamppost rule leaves open ample alternative channels of communication. The rule does not limit anyone's ability to say in multiple ways and for unlimited duration the very same thing she or he seeks to announce on lamppost posters. People may hand out leaflets or speak to passers-by with the same message, or put that message on bumper stickers. They may circulate or march wearing or holding the very same signs, post or erect the same signs on private property with the owners' permission, and post messages on various electronic and physical billboards, publications, or pages to communicate about their events. Nothing in the challenged rule prevents anyone from using such channels for as long as they like, even after their event has taken place. The challenged rule merely limits event-related posters from continuing to occupy the limited space on

publicly owned lampposts more than thirty days after the relevant event has passed.

There are admitted advantages to postering: It is a relatively inexpensive method for an organization to broadcast its message; it can be targeted to a particular neighborhood; and it requires less time commitment than leafletting or a direct-advocacy campaign. *See, e.g.*, *Taxpayers for Vincent*, 466 U.S. at 812. But the District's regulation does not foreclose affixing posters to public lampposts as a channel of communication; it merely imposes reasonable limits on the duration that a poster may be left up after the event has passed. Moreover, as the Supreme Court explained in upholding a complete ban on the posting of signs on publicly owned lampposts, even a full ban does

> not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited. To the extent that the posting of signs on public property has advantages over these forms of expression, there is no reason to believe that these same advantages cannot be obtained through other means.

*Id*. at 812 (citation and footnote omitted); *see also id*. n.30.

The District's regulation amounts to a reasonable time, place, and manner restriction. Given the nature and plausibility of the District's justification for requiring event-related signs to be removed within thirty days of the event, there was no need for the District to introduce evidence demonstrating the relationship between that justification and the regulation.

### C. MASF's Vagueness Challenge Fails

MASF presents a further facial challenge to the lamppost regulation on the ground that it is unconstitutionally vague. A law may be vague in violation of the Due Process Clause for either of two reasons: "First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *see F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). MASF made both types of arguments to support its vagueness claim, but in granting summary judgment to MASF the district court addressed only the discriminatory-enforcement theory, holding that the definition of "event" in section 108.13 of the regulation delegates impermissible enforcement discretion to the District's inspectors. *ANSWER IV*, 905 F. Supp. 2d at 348. The court found it unnecessary to decide whether section 108.13 also fails to give constitutionally adequate notice of what amounts to an event-related sign, *see id.*, and on appeal MASF does not press a notice theory of vagueness. We therefore consider only whether section 108.13 delegates impermissibly unbridled enforcement discretion.

First, we address a potential threshold obstacle. The District contends that a facial vagueness challenge is foreclosed by the Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). Under *Humanitarian Law Project*, a party whose own expressive activity is clearly proscribed cannot challenge a law's vagueness as it might apply to facts not before the court. *Id.* at 20. *Humanitarian Law Project* addressed "only whether the statute 'provide[s] a person of ordinary intelligence fair notice of what is prohibited,'" 561 U.S. at 20 (quoting *United*

*States v. Williams,* 553 U.S. 285, 304 (2008)), observing that "Plaintiffs do not argue that the material-support statute grants too much enforcement discretion to the Government." *Id.* We are aware of no decision that has applied *Humanitarian Law Project* to bar a facial challenge like MASF's that a law is so vague as to subject the challenger itself to standardless enforcement discretion. *See Fox*, 132 S. Ct. at 2317-18 (assuming facial vagueness challenges remain available when based on an enforcement-discretion theory).

Indeed, it is not apparent how the *Humanitarian Law Project* rule—barring a person to whom a legal provision clearly applies from challenging its facial failure to give sufficient notice to others, *see* 561 U.S. at 20—could apply to a claim that a law is so vague as to fail to guide the government's enforcement discretion. At least in a pre-enforcement posture, such a claim is by its nature facial. "Self-censorship is immune to an 'as applied' challenge, for it derives from the individual's own actions, not an abuse of government power." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). "It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). Therefore, "only a facial challenge can effectively test the statute." *City of Lakewood*, 486 U.S. at 758; *see also Morales*, 527 U.S. at 52 (holding that vagueness that "fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests" is subject to facial challenge).

Whereas *Humanitarian Law Project* determined that the law's applicability to the particular plaintiff was clear, a court faced with an arbitrary-enforcement theory has no way to discern in advance whether the exercise of unbridled

enforcement discretion will spare the plaintiff's constitutionally protected expression from prosecution. *Cf., e.g.*, *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992) (describing as "irrelevant" the uncodified criteria actually applied to the challenger's case by officials allegedly imbued with undue enforcement discretion). And once enforcement discretion has been exercised to punish constitutionally protected expression and the speaker defends on that ground, the vagueness defect escapes review. We thus proceed on the assumption that a facial, pre-enforcement vagueness challenge of the kind MASF presents here is consistent with *Humanitarian Law Project*. *Cf. Agostini v. Felton,* 521 U.S. 203, 237 (1997) (noting that lower courts should not conclude that cases overrule precedent by implication).

On the merits of MASF's claim that section 108.13 is void for vagueness, we begin with the "basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A statute authorizes an impermissible degree of enforcement discretion—and is therefore void for vagueness—where it fails to "set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'" *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (quoting *Grayned*, 408 U.S. at 108). "When speech is involved," the Supreme Court has cautioned, "rigorous adherence" to the requirement of a reasonable degree of clarity "is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 132 S. Ct. at 2317.

Section 108.13 sets reasonably clear guidelines for law enforcement officers to determine whether a sign is event related, and therefore is not unconstitutionally vague. The

regulation defines an "event" as "an occurrence, happening, activity or series of activities, specific to an identifiable time and place, if referenced on the poster itself or reasonably determined from all circumstances by the inspector." D.C. MUN. REGS. tit. 24, § 108.13. Section 108.13 does not give enforcement officials so little guidance as to permit them to "act in an arbitrary or discriminatory way." *Fox*, 132 S. Ct. at 2317. In any system that relies on the administration of laws of general applicability in many different circumstances, some degree of ambiguity is all but inevitable. And, indeed, there is some evidence in this record that section 108.13 is susceptible of inconsistent application. "What renders a statute vague," however, "is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306. Here, the fact targeted by the "event-related" limitation is clear: To relate to an "event," a sign must relate to "an occurrence, happening, activity or series of activities, specific to an identifiable time and place." That is not a vague standard.

Those laws that courts have held to be constitutionally infirm for vagueness gave significantly less guidance to enforcement agents than does 108.13's definition of an event-related sign. In *Kolender*, for example, a statute requiring a suspect to present "credible and reliable" identification gave police impermissibly open-ended enforcement discretion. *Kolender v. Lawson*, 461 U.S. 352, 358-60 (1983). That statute "contain[ed] no standard for determining" how to meet the highly subjective "credible and reliable" requirement. *Id*. at 358. In *Niemotko v. Maryland*, too, no standard or guideline whatsoever cabined the Park Commissioner's and the City Council's discretion whether to grant a permit to hold a demonstration in the city park; officers were empowered to rely on nothing more than their own inclinations regarding

each permit request. 340 U.S. 268, 271-72 (1951); *see also, e.g.*, *Armstrong v. D.C. Pub. Library*, 154 F. Supp. 2d 67, 81-82 (D.D.C. 2001) (striking for vagueness a regulation prohibiting "objectionable" appearance in a library). The District of Columbia's criteria for defining an "event-related" lamppost sign, in contrast, adequately specify that the post-event time limitation applies to signs announcing an event or series of events of the type that occur at a specified time and place.

MASF sees impermissible leeway in section 108.13's explicit recognition of the enforcement officer's authority to refer to "all circumstances" to determine whether a poster is event related. *See* D.C. MUN. REGS. tit. 24, § 108.13. In particular, section 108.13 directs enforcement officers to consider not only the poster itself, but to use their common sense and background knowledge to determine whether, in context, a poster in fact relates to "an occurrence, happening, activity or series of activities, specific to an identifiable time and place." Thus, the event-relatedness of even a terse sign announcing a renowned local athletic event, a seasonal charity event, or a candidate for election could be determined to be event related in part based on circumstances apart from the poster itself. Nothing about such an inquiry renders the law vague. To the extent enforcement agents draw on surrounding circumstances to *un*reasonably infer that a sign is event related in accordance with the District's rule, the event-relatedness restriction would not apply. *See* D.C. MUN. REGS. tit. 24, § 108.13. So long as their inferences are reasonable, however, the rule's open-endedness about the evidence that may be used to meet that standard does not convert its otherwise clear limitation into an impermissibly vague one.

MASF highlights deposition testimony from the District's inspectors that, it argues, shows the unconstrained

discretion section 108.13 affords the police inspectors. Inspectors confirmed that they had some leeway to assess event-relatedness, *see ANSWER IV*, 905 F. Supp. 2d at 347 & n.10, and were not unanimous as to whether a 2012 poster stating simply "GRAHAM!" pertained to the reelection campaign of City Council member Jim Graham and so was event-related. MASF also highlights testimony of Inspectors who had difficulty deciding the time limitation applicable to posters listing multiple events with different dates. But the most that evidence shows is that section 108.13 might be misapplied in certain cases. It does not show that section 108.13 lacks criteria to cabin enforcement discretion.

As the Supreme Court explained in the analogous context of a facial First Amendment challenge to a licensing scheme, "the success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion [unlawfully], but whether there is anything in the ordinance preventing him from doing so." *Forsyth Cty*, 505 U.S. at 133 n.10. The District's regulation guards against the unlawful exercise of discretion by delimiting what qualifies as an event: "an occurrence, happening, activity or series of activities, specific to an identifiable time and place." D.C. MUN. REGS. tit. 24, § 108.13. Ostensible vagueness about "whether the incriminating fact . . . has been proved" is not vagueness at all. *Williams*, 553 U.S. at 306. We accordingly hold that section 108.13 is not void for vagueness.

### D. The District Court Correctly Dismissed the Organizations' Other Claims

We next consider the organizations' cross-appeal. They appeal from the district court's 2011 dismissal of ANSWER's

claim that the District retaliated against it in violation of the First Amendment by citing as violations posters that were lawful under the regulation. *ANSWER III*, 798 F. Supp. 2d at 153-55. They also appeal the court's dismissal of MASF's claim that the District's regulation imposes a system of "strict liability" in violation of the First Amendment. *Id.* at 152-53. We review *de novo* the district court's decision under Rule 12(b)(6) to dismiss those claims, *see English v. District of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013), and we affirm.

**1. *ANSWER Fails to State a § 1983 Claim.*** In its complaint, ANSWER alleged that the District's issuance of ninety-nine notices of violation against it had been "in bad faith and for the purpose of harassment." Supplemental Complaint ¶¶ 42-43, *ANSWER III*, 798 F. Supp. 2d 134 (No. 07-1495). The district court found that ANSWER had plausibly pled a constitutional violation, but dismissed the complaint for failure to allege that a custom or policy of the District had caused that violation. *ANSWER III*, 798 F. Supp. 2d at 154-55.

Section 1983 "give[s] a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position." *Monroe v. Pape*, 365 U.S. 167, 172 (1961) *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Both states and cities can be sued under section 1983, *Monell*, 436 U.S. at 663, 690, and for that purpose the District of Columbia is treated as a city, *Jones v. Horne*, 634 F.3d 588, 600 (D.C. Cir. 2011). The District may be liable under section 1983, but only to the extent permitted under *Monell*— *i.e.*, only based on action that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or for harm "visited pursuant to governmental 'custom' even though such

custom has not received formal approval." *Monell*, 436 U.S. at 690-91. Under *Monell*, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id*. at 691. The "touchstone of" a section 1983 claim against a municipality is that "official policy is responsible for a deprivation of rights protected by the Constitution." *Id*. at 690. That is, the alleged policy or custom must have "caused the violation." *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004).

ANSWER has not alleged that a custom or policy lay behind the notices of violation the District issued to it. On appeal, ANSWER argues that "the 99 enforcement actions were sufficiently pervasive and numerous to constitute a custom." Organizations' Br. 67. A section 1983 plaintiff may establish causation in several ways, but ANSWER has not contended that any District custom or policy was "the moving force of the constitutional violation." *Jones*, 634 F.3d at 601. Nor has ANSWER sought to show causation based on a failure to train or "deliberate indifference." *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). It makes no case that a policymaker knowingly ignored the alleged pattern of retaliatory enforcement. *See Jones*, 634 F.3d at 601. ANSWER does not even identify by name or title any policy maker who knew of the enforcement actions the District took against it. The closest ANSWER comes to claiming a role for a policymaking official is its discussion of the District's Department of Public Works' General Counsel's voluntary dismissal of the enforcement actions against ANSWER. But at most that shows a policymaker's involvement in curbing allegedly unconstitutional enforcement.

The district court was correct, then, to dismiss ANSWER's claims because the organization "never coherently allege[d] the existence of a broader municipal custom or practice that explains the issuance of those tickets" citing ANSWER for violating the sign posting rule. *ANSWER III*, 798 F. Supp. 2d at 154.

***2. The Regulation Does Not Impose "Strict Liability."*** MASF contends that the District's regulation imposes a "strict liability" regime in violation of the First Amendment. Strict liability in criminal statutes burdening speech is "generally disfavored." *United States v. Sheehan*, 512 F.3d 621, 629 (D.C. Cir. 2008). But we need not decide whether the imposition of civil fines on a strict-liability basis would be constitutional here because, as we construe the regulation, it does not impose strict liability.

Section 108.1 says, "No person shall affix a sign, advertisement, or poster to any public lamppost or appurtenances of a lamppost, except as provided in accordance with this section." D.C. MUN. REGS. tit. 24, § 108.1. MASF asserts in its complaint that the District "imposes strict liability for violation of these regulations upon persons or groups whose name or address is identified in a poster even if the person/group did not produce the poster." First Am. Compl. ¶ 25, *ANSWER I*, 570 F. Supp. 2d 72 (No. 07-1495); *see id.* ¶¶ 25-32. By "strict liability," MASF seems to mean something closer to "vicarious liability"—that is, holding one party liable for the actions of another. *See generally* Liability, Black's Law Dictionary (10th ed. 2014).

Section 108.1 by its terms provides that no person may "affix" an offending sign to a lamppost. On its face, therefore, section 108.1 does not impose liability on anyone other than the person who "affixes" the sign to the lamppost.

The District in defending the rule assures us that it makes "a person liable only if that person is responsible for the unlawfully posted sign because, for example, he or she directed or encouraged the posting or his or her employee or agent posted it." Gov't Reply Br. at 39.

MASF invokes *Schneider v. New Jersey*, 308 U.S. 147 (1939), in which the Supreme Court held that a municipal ordinance imposing liability on the distributors of pamphlets for the litter left by the recipients of the pamphlets was unnecessarily burdensome on the speech rights of the pamphleteers. *Id*. at 162. The *Schneider* Court held that imposing liability on the distributor of the pamphlets could not be justified by the cities' interest in preventing litter because the cities had an obvious alternative method to prevent litter: They could impose liability on "those who actually throw papers on the streets." *Id*.

But MASF gives us no reason to think that an organization would be held liable under section 108.1 if it did not "affix" a sign, but rather had its sign affixed by someone else acting without its authority who then failed timely to remove it. Nor has MASF raised a material question of fact as to whether the District has enforced the regulation to impose the type of strict or vicarious liability of which the *Schneider* Court disapproved. In light of the District of Columbia's binding assurances and the lack of record evidence to the contrary, we do not read section 108.1 to impose strict or vicarious liability, and so affirm the district court's decision to dismiss MASF's strict-liability claim.

## E.  Discovery Sanctions are Vacated

Finally, we address the discovery sanctions the district court imposed against the District of Columbia under Federal Rule of Civil Procedure 16(f). We review the district court's

award of sanctions for an abuse of discretion, *see Perkinson v. Gilbert/Robinson, Inc.*, 821 F.2d 686, 689 (D.C. Cir. 1987), and vacate it.

Rule 16(f)(2) gives courts a tool to enforce compliance with its scheduling orders. That rule directs that a court, "[i]nstead of or in addition to any other sanction, . . . must order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 16(f)(2). But a court may award sanctions under Rule 16(f) only where a party violates an unambiguous order. *See Ashlodge, Ltd. v. Hauser*, 163 F.3d 681, 684 (2d Cir. 1998), *overruled on other grounds, as stated in New Pac. Overseas Grp. (U.S.A.) Inc. v. Excal Int'l Dev. Corp.*, 272 F.3d 667, 669 (2d Cir. 2001) ("To sustain sanctions under Rule 16(f), an order must be unambiguous . . . ."); *cf. United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008). The order that the District allegedly violated here was ambiguous.

The court's scheduling order authorized MASF to take discovery but was silent as to the District. Before the court issued the order, the District and MASF had submitted a joint status report. The joint report explained that the District believed discovery was "unnecessary here, as the remaining facial vagueness challenge presents a purely legal question." J.A. at 97. MASF, however, proposed that the court allow it to propound ten interrogatories, ten requests for production, fifteen requests for admission, and allow it to take six depositions. In response to MASF's suggestion, the District suggested the court allow MASF ten interrogatories, five requests for production, and one deposition. Neither party

addressed the scope of District's anticipated discovery in the event that the court imposed discovery constraints on MASF.

MASF and the District each submitted a proposed scheduling order: The District's order contemplated that "each party may not propound more than ten (10) interrogatories (including sub-parts) and five (5) requests for production of documents, and may not take more than one (1) deposition." J.A. at 103. That is, the District's proposed order tracked the limited discovery it had suggested in the Joint Status Report, contemplating that the limits would apply equally to both parties. MASF's proposed order suggested less restrictive limits on its own discovery, and did not specify whether or to what extent the District's discovery would be restricted. With some stylistic modifications, the court adopted MASF's proposed order, stating that "plaintiff is authorized to propound not more than" the specified numbers of interrogatories, requests for production, requests for admission, and deposition notices; the order made no mention of any discovery restriction on the District of Columbia.

The District sent eleven interrogatories and three requests for production to MASF and ANSWER. After plaintiffs' counsel objected, the District withdrew six of its interrogatories but insisted on its right to conduct discovery. MASF then moved for a protective order and sanctions. The court granted the motion.

We acknowledge the district courts' prerogative to sanction parties for noncompliance with their orders, but we must vacate the sanctions here because the underlying order was ambiguous as to whether it limited the District's discovery rights. It expressly lowered the default caps in the Federal Rules of Civil Procedure only as to the plaintiffs. The order referred more generally to the earliest date on which

"discovery requests may be served" and when "the parties" should file their dispositive motions. J.A. at 105. In context, the order could reasonably be read (a) to leave the District's discovery rights as specified in the Federal Rules, (b) to implicitly subject it to the same lower caps the court applied to plaintiffs, or (c) to permit limited discovery to the plaintiffs while by negative implication barring any discovery whatsoever by the District.

In the context of the dueling proposed orders—one equally limiting both parties and the other, which the court accepted, speaking only to plaintiffs—the court's order could reasonably be read to constrain only the plaintiffs. Such one-sided treatment seems sensible enough given that the District, which as defendant did not bear the burden of proof, was unlikely to need extensive discovery in any event. That same reasoning might, alternatively, support reading the order as setting limits equally applicable to both parties, given that the District had urged the court to proceed without any discovery and presumably was willing to work within any constraints it could persuade the court to impose. Alternatively, framed as it was affirmatively to "authorize" the plaintiffs, and only plaintiffs, to take the specified discovery, and issuing against the backdrop of the District's initial argument against any discovery for either party, the order might be read—as the court evidently intended—to preclude the District from taking any discovery.

There are, however, strong background principles that cut against the district court's intended reading. Under Rule 26, a party may take discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Critically, a party has that prerogative without the order of a court. A court order may "otherwise limit[]" a

party's discovery right, but a court's affirmative permission is not a prerequisite to the taking of discovery. *Id.* Given the general discovery authorizations in the Federal Rules of Civil Procedure, which are not contingent on court orders granting permission, the district court's scheduling order was ambiguous. Sanctions for the District's service of discovery requests were therefore unwarranted, and are vacated.

\* \* \*

For the foregoing reasons, we reverse the district court's grant of summary judgment to MASF on its facial First Amendment and due process challenges to the District of Columbia's regulation and remand for the district court to enter summary judgment for the District. We affirm the court's decision to dismiss ANSWER's claim for damages and MASF's claim alleging an impermissible strict liability regime. Finally, we vacate the court's award of sanctions.

*So ordered.*