RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0233p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

WILLIAM HAROLD THOMAS, JR.,

*Plaintiff-Appellee*,

*v.*

No. 17-6238

CLAY BRIGHT, Commissioner of Tennessee Department of Transportation,

*Defendant-Appellant*.

———————————

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:13-cv-02987—Jon Phipps McCalla, District Judge.

Argued: January 30, 2019

Decided and Filed: September 11, 2019

Before: COLE, Chief Judge; BATCHELDER and DONALD, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Sarah Campbell, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. Owen Yeates, INSTITUTE FOR FREE SPEECH, Alexandria, Virginia, for Appellee. Lindsey Powell, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Eugene Volokh, UCLA SCHOOL OF LAW, Los Angeles, California, for Amici Curiae. **ON BRIEF:** Sarah Campbell, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. Owen Yeates, Allen Dickerson, INSTITUTE FOR FREE SPEECH, Alexandria, Virginia, for Appellee. Lindsey Powell, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Eugene Volokh, UCLA SCHOOL OF LAW, Los Angeles, California, Kannon K. Shanmugam, A. Joshua Podoll, WILLIAMS & CONNOLLY LLP, Washington, D.C., Ilya Shapiro, CATO INSTITUTE, Washington, D.C., Braden H. Boucek, BEACON CENTER OF TENNESSEE, Nashville, Tennessee, Timothy Sandefur, GOLDWATER INSTITUTE, Phoenix, Arizona, Robert Alt, THE BUCKEYE INSTITUTE, Columbus, Ohio, for Amici Curiae.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.  Under Tennessee's Billboard Act, anyone intending to post a sign along a Tennessee roadway must apply to the Tennessee Department of Transportation (TDOT) for a permit, unless the sign falls within one of the Act's exceptions. This case presents a constitutional challenge to the Act, based on the "on-premises exception" for signs relating to the use or purpose of the real property (premises) on which the sign is physically located, typically signs advertising the activities, products, or services offered at that location.

William Thomas owned a billboard on an otherwise vacant lot and posted a sign on it supporting the 2012 U.S. Summer Olympics Team.  Tennessee ordered him to remove it because the State had denied him a permit and the sign did not qualify for the exception, given that there were no activities on the lot to which the sign could possibly refer.  Thomas sued, claiming that this application of the Billboard Act violated the First Amendment.  The district court held the Act unconstitutional because the on-premises exception was content-based and thus subject to strict scrutiny, failed to survive strict scrutiny, and was not severable from the rest of the Act. We affirm, recognizing that *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), overruled our existing circuit precedent on this issue in *Wheeler v. Commissioner of Highways*, 822 F.2d 586 (6th Cir. 1987).

## I.  BACKGROUND

### A.  Tennessee's Billboard Act

In 1965, Congress enacted the Federal Highway Beautification Act ("HBA"), 23 U.S.C. § 131, which sought to "promote the safety and recreational value of public travel, and to preserve natural beauty."  *Id*.  The HBA conditions ten percent of a State's federal highway funds on the State's maintaining "effective control" of signs within 660 feet of an interstate or primary highway, *id*. at § 131(b), meaning the State must limit signage to (1) "directional and official signs and notices," (2) "advertising [for] the sale or lease of property upon which

[the sign is] located," (3) "advertising [for] activities conducted on the property on which [the sign is] located," (4) "landmark[s] . . . or historic or artistic significance," or (5) "advertising [for] the distribution by nonprofit organizations of free coffee." *Id*. at § 131(c). The State may also, with U.S. Department of Transportation approval, permit signs in areas zoned industrial or commercial. *Id*. at § 131(d).

In order to comply with the HBA and ensure full federal funding, Tennessee enacted the Billboard Regulation and Control Act of 1972 ("Billboard Act"), Tenn. Code Ann. (T.C.A.) § 54-21-101, *et seq*. The Billboard Act parallels the HBA in most relevant respects and prohibits all outdoor signage within 660 feet of a public roadway unless expressly permitted by TDOT permit. *Id*. § -103. But the Act also provides exceptions under which certain signs may be posted without permit, including an exception for signage "advertising activities conducted on the property on which [the sign is] located." *Id*. § -103(3). This is referred to as the "on-premises exception" and corresponds to the HBA's third limitation. Under the Act's implementing regulations:

> A sign will be considered to be an on-premise[s] sign if it meets the following requirements:
>
> (a) Premise[s] - The sign must be located on the same premises as the activity or property advertised.
>
> (b) Purpose - The sign must have as its purpose (1) the identification of the activity, or its products or services, or (2) the sale or lease of the property on which the sign is located, rather than the purpose of general advertising.

Tenn. Comp. R. & Regs. (T.C.R.R.) § 1680-02-03-.06(2). The regulations elaborate further:

> The following criteria shall be used for determining whether a sign has as its purpose [] the identification of the activity located on the premises or its products or services, . . . rather than the business of outdoor advertising.
>
> (a) General
>
> > 1.    Any sign which consists solely of the name of the establishment is an on-premises sign.
> >
> > 2.    A sign which identifies the establishment's principle [sic] or accessory product or services offered on the premises is an on-premises sign.

3. An example of an accessory product would be a brand of tires offered for sale at a service station.

(b) Business of Outdoor Advertising

1. When an outdoor advertising device (1) brings rental income to the property owner, or (2) consists principally of brand name or trade name advertising, or (3) the product or service advertised is only incidental to the principle [sic] activity, it shall be considered the business of outdoor advertising and *not an on-premises sign*. An example would be a typical billboard located on the top of a service station building that advertised a brand of cigarettes or chewing gum which is incidentally sold in a vending machine on the property.

2. An outdoor advertising device which advertises activities conducted on the premises, but which also advertises, in a prominent manner, activities not conducted on the premises, is *not an on-premises sign*. An example would be a sign advertising a motel or restaurant not located on the premises with a notation or attachment stating 'Skeet Range Here,' or 'Dog Kennels Here.' The on-premises activity would only be the skeet range or dog kennels.

T.C.R.R. § 1680-02-03-.06(4) (emphasis added; alteration of "premise" to "premises" throughout). So, to recap, and to be a bit more specific, the sign must (1) be physically located on the same "premises" (real property) as the activity being advertised on the sign, and must (2) have as its purpose the identification of that activity occurring on the premises, or the products or services provided by that activity on the premises, not the purpose of advertising generally or advertising an activity, product, or service occurring elsewhere.

Finally, we would be remiss if we did not acknowledge that, by all indications, the Act was intended to, and routinely does, apply to only commercial speech, namely, advertising. But in this case, Tennessee applied the Act to restrict speech conveying an idea: "non-commercial speech" that was not advertising nor commercial in any way, but might be labeled "patriotic speech."

## B. State Court Litigation

In 2006, Thomas—the owner of over 30 billboards in Tennessee—applied to the TDOT for a permit to erect a billboard on a vacant lot, hereinafter referred to as the "Crossroads Ford billboard," on which he would display a commercial advertisement. TDOT denied the

application but Thomas constructed the Crossroads Ford billboard and posted his sign anyway. TDOT sued in the Tennessee state court, claiming that Thomas was in violation of the Billboard Act and also arguing that the Crossroads Ford billboard could not satisfy the on-premises exception because it was located on a vacant lot with no on-premises activity whatsoever.

The state trial court found "substantial evidence of selective and vindictive enforcement against [Thomas]," including emails from TDOT employees working in concert with a competitor of Thomas's to "defeat" him, and unsolicited emails sent from TDOT employees to advertisers on Thomas's other billboards suggesting that his billboards were illegal and that associating with Thomas would reflect "negatively" on them. The court granted a temporary restraining order forbidding TDOT from enforcing the Billboard Act against Thomas's Crossroads Ford billboard until further notice. Thomas subsequently obtained a billboard permit from the Memphis and Shelby County (Tenn.) Office of Construction Code Enforcement but did not obtain a state permit from TDOT. He used the Crossroads Ford billboard for commercial advertising until 2012. Meanwhile, TDOT had appealed the decision and the Tennessee Court of Appeals vacated the judgment and remanded the case, instructing the trial court to hear Tennessee's requests for relief. *State ex rel. Dep't of Transp. v. Thomas*, 336 S.W.3d 588, 608 (Tenn. Ct. App. 2010).

By 2012, Thomas had stopped posting commercial advertising on the Crossroads Ford billboard and instead had posted a message about free speech, which he later changed to "Go USA!," imposed on a large American flag, in support of the USA Olympic Team in the 2012 Summer Games. On remand, the state trial court found that this, the conveyance of an idea, was not commercial advertising, and was excepted from TDOT's authority to enforce the Billboard Act. TDOT again appealed and the Tennessee Court of Appeals again reversed, reiterating that, "[u]nless [the sign] fits within one of the exceptions named in the Act, if he does not have a State billboard permit, [Thomas] is not allowed to erect a billboard[,] [p]eriod[,] . . . [r]egardless of what message is displayed on the Crossroads Ford site billboard." *State ex rel. Dep't of Transp. v. Thomas*, 2014 WL 6992126 at *7 (Tenn. Ct. App. Dec. 11, 2014) (editorial mark, quotation marks, and citation omitted).

On remand, Thomas relied on the district court's opinion here, which was proceeding simultaneously, to persuade the state trial court to reinstate its original order (in his favor), but the Tennessee Court of Appeals again reversed, holding that "the 2017 [f]ederal [d]istrict [c]ourt [r]uling does not represent a change in controlling law for purposes of the law of the case doctrine," and this time reassigning the case to a different trial judge. *State ex rel. Dep't of Transp. v. Thomas*, 2019 WL 1602011, at *8 (Tenn. Ct. App. Apr. 15, 2019). Thus, state proceedings are ongoing.

## C. *Federal Court Litigation*

In 2013, Thomas sued in federal court, alleging that the Billboard Act was an unconstitutional restriction of speech in violation of the First Amendment. The district court ultimately agreed, quoting and relying on *Reed*, 135 S. Ct. at 2222, for the proposition that "a law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Thomas v. Schroer*, 248 F. Supp. 3d 868, 871 (W.D. Tenn. 2017) (quotation and editorial marks omitted). The district court explained that, under the Act, "the only way to determine whether a sign is an on-premise[s] sign, is to consider the content of the sign and determine whether that content is sufficiently related to the activities conducted on the property on which they are located," *id*. at 879 (quotation marks and record citation omitted), so the Act "is a content-based regulation that implicates Thomas's noncommercial speech," *id*. at 878. This required strict scrutiny, which the Act "does not survive," *id.*, because Tennessee's asserted interests are not compelling, *id*. at 881-82, nor is the Act narrowly tailored to achieve them, *id*. at 885. The court held the Billboard Act unconstitutional as applied to the Crossroads Ford billboard sign. *Id*.

Thomas moved to expand the relief he sought, asking the district court to permanently enjoin Tennessee from enforcing the Billboard Act against *all* signs or at least against *all of his* signs. Thomas argued that his challenge had been both facial and as-applied, but the court held that it was only as-applied and Thomas had not justified an expansion of the relief sought. *Thomas v. Schroer*, No. 13-cv-02987, 2017 WL 6489144, at *1 (W.D. Tenn. Sept. 20, 2017) ("On March 31, 2017, the [c]ourt found the Billboard Act, as applied to Thomas's non-

commercial messages on his Crossroads Ford sign, a violation of the Free Speech provision of the First Amendment of the United States Constitution."); *see also id.* at \*7 ("Upon review of the record, it is clear that [Thomas] has not alleged the Billboard Act is unconstitutional in all its applications, or even unconstitutional as to a substantial number of applications."). The court permanently enjoined Tennessee from enforcing the Billboard Act against Thomas's Crossroads Ford sign. *Id.* at \*10.

At the same time, Tennessee had moved the court to reconsider its holding that the Billboard Act was not severable. The court denied the motion, finding that there was no clear or prudent line at which to sever, *id.* at \*5, and nothing in the Act said that it was severable, as is required for severability under Tennessee law, or that the Tennessee legislature would have enacted it without the unconstitutional portions, *id.* at \*3. Thus, the court declined to save the Act's commercial or off-premises aspects by severing the on-premises exception, and instead left that for the Tennessee legislature.[1] *Id.* at \*5. Thomas resumed commercial advertising on his Crossroads Ford billboard and Tennessee appealed the judgment here.

## II. ANALYSIS

Tennessee appeals the district court's holding that the Billboard Act, as effectuated by the on-premises exception, is an unconstitutional restriction of Thomas's non-commercial speech at the Crossroads Ford billboard location. We review de novo a district court's decision on the constitutionality of a State statute, including whether the statute satisfies the applicable level of scrutiny. *Assoc. Gen. Contr. of Ohio, Inc. v. Drabik*, 214 F.3d 730, 734 (6th Cir. 2000).

### A. *Exceptions as Restrictions*

The restriction here is based on an exception to a regulation, which makes the exception—the *denial of the exception*, actually—the restriction. This posture does not change our analysis.

---

[1]The district court's rulings reflect an apparent inconsistency: on one hand, the Act was not severable and entirely unconstitutional, but on the other hand, the court limited its as-applied holding to Thomas's non-commercial speech on his Crossroads Ford billboard. Whatever the practical effects, this does not affect our analysis in this appeal.

Textually, the Billboard Act is a blanket, content-neutral prohibition on any and all signage speech except for speech that satisfies an exception; here, the on-premises exception. In this way, Tennessee favors certain content (i.e., the excepted content) over others, so the Act, "on its face," discriminates against that other content. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564-66 (2011). The fact that this content-based aspect is in the *exception* to the general restriction, rather than the restriction itself, does not save it from this analysis. *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) ("Selective exclusions from [speech restrictions] may not be based on content alone, and may not be justified by reference to content alone."); *see City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (the notion that the exceptions to a restriction of speech may be insufficiently expansive "is firmly grounded in basic First Amendment principles").

## B. Severability

The district court held that the Billboard Act was not severable, and Tennessee has not challenged that holding in this appeal. We will not *sua sponte* address the merits of that issue.

Tennessee had argued to the district court that the non-commercial, on-site exception was severable from the remainder of the Act, particularly the commercial or off-site applications, and, after losing that argument, moved the court to reconsider, which the court denied:

> [T]he [c]ourt declines (1) to find the Billboard Act's provisions concerning outdoor advertising severable as to the challenged provisions or (2) to sever the non-commercial application of those provisions. The Billboard Act does not explicitly address whether it could function without the on-premises/off-premises provision or without application to non-commercial speech.

*Thomas*, 2017 WL 6489144, at *4. But Tennessee did not raise severability here, in either its briefing or during oral argument. We do not decide issues or arguments that are not directed to us, nor do we make or assume them on behalf of litigants. *See Gradisher v. City of Akron*, 794 F.3d 574, 586 (6th Cir. 2015). Therefore, we will not disturb the district court's determination that the Act, as applied in this case, is unconstitutional inasmuch as the on-premises exception is not severable from it, and that "it is for the Tennessee State Legislature—and not this [c]ourt—to clarify the Legislature's intent regarding the Billboard Act in the wake of *Reed*." *Thomas*, 2017 WL 6489144, at *5.

### C. *Content-Based Restrictions*

The Billboard Act's on-premises exception scheme is a content-based regulation of (restriction on) free speech. Although we discuss this at length, this is neither a close call nor a difficult question. If not for Tennessee's proffered disputes, we would label this "indisputable."

When a case implicates a core constitutional right, such as a First Amendment right, we must determine the level of scrutiny to apply based on whether the restriction is content-based or content-neutral. *Reed*, 135 S. Ct. at 2226-27. Because Thomas's challenge to the Act concerned only non-commercial speech ("Go USA!") and this appeal stems from the district court's as-applied holding, we necessarily confine the analysis here to non-commercial speech and need not consider the commercial-speech doctrine. And, as just explained, the provision is not severable.

Under the First Amendment, the State may regulate certain aspects of speech but has "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95. Content-based regulations are "presumptively unconstitutional" and analyzed under strict scrutiny. *Reed*, 135 S. Ct. at 2226. Content-neutral regulations of non-commercial speech need only survive intermediate scrutiny. *Id*. at 2228.

Although "[d]eciding whether a particular regulation is content-based or content-neutral is not always a simple task," *Turner Broad. Sys. Inc., v. FCC*, 512 U.S. 622, 642 (1994), the Supreme Court has provided several means for doing so. As applicable here, a law regulating speech is facially content-based if it "draws distinctions based on the message," *Reed*, 135 S. Ct. at 2227; if it "distinguish[es] among different speakers, allowing speech by some but not others," *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340 (2010); or if, in its application, "it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred," *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (quoting *FCC v. League of Women Voters*, 468 U.S. 364, 383 (1984)) (quotation marks omitted).[2]

---

[2]The Court has also recognized that some laws "though facially content-neutral, will be considered content-based," *Reed*, 135 S. Ct. at 2227, such as if the law "cannot be justified without reference to the content of the regulated speech" or was "adopted by the government because of disagreement with the message [the prohibited speech] conveys." *Id*. (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (quotation marks omitted).

The Billboard Act's on-premises exception allows a property owner to avoid the permitting process and proceed to post a sign without any permit, so long as the sign is "advertising activities conducted on the property on which [the sign is] located." T.C.A. § 54-21-103(3). The enabling regulation specifies that the sign must be "located on the same premises as the activity" and "have as its purpose [the] identification of the activity[,] products[,] or services [offered on that same premises]." T.C.R.R. § 1680-02-03-.06(2). Therefore, to determine whether the on-premises exception does or does not apply (i.e., whether the sign satisfies or violates the Act), the Tennessee official must read the message written on the sign and determine its meaning, function, or purpose.

The Supreme Court has made plain that a purpose component in a scheme such as this is content-based: "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its *function or purpose*." *Reed*, 135 S. Ct. at 2227 (emphasis added). Clearly, this regulatory scheme requires Tennessee officials to assess the meaning and purpose of the sign's message in order to determine if the sign violated the Act. *See McCullen*, 573 U.S. at 479. To digress a bit, a sign written in a foreign language would have to be translated (and interpreted) before a Tennessee official could determine whether the on-premises exception would apply or the sign violated the Act. There is no way to make those decisions without understanding the content of the message. More to the point here, Tennessee's own agent confirmed at trial that officials would be "looking at the content of [the] sign to make [a] determination whether it's on-premises or off-premises." That makes the Billboard Act—via the on-premises exception—content based. "[A] regulatory scheme [that] requires a municipality to examine the content of a sign to determine which ordinance to apply . . . appears to run afoul of *Reed*'s central teaching." *Wagner v. City of Garfield Heights*, 675 F. App'x 599, 604 (6th Cir. 2017) (quotations omitted).

Moreover, under this scheme, to determine whether a violation has occurred, the Tennessee official not only "examines the content of the *message* that is conveyed," *see McCullen*, 573 U.S. at 479 (emphasis added), but must also identify, assess, and categorize the

---

Because the Billboard Act is facially content-based, however, we need not proceed to these other means in this analysis.

activity conducted at that location and determine whether the content of the message sufficiently relates to that activity, product, or service. *See* T.C.R.R. § 1680-02-03-.06(2). The examples provided in the Tennessee regulations are relatively straightforward: a sign on a service station advertising a brand of tires versus one advertising a brand of cigarettes. *Compare* -.06(4)(a)(3) *with* (b)(1). And the present case is hardly more difficult, given that the Crossroads Billboard is on a vacant lot. But what if this sign, with its "Go USA!" and American flag referencing the Summer Olympics were posted on a U.S. Olympic Committee facility? Or on an unaffiliated athletic training facility, a retail store selling U.S. Olympic Team merchandise, an NBC station broadcasting the Games, a travel agency offering discount trips to London for the Games, a casino with wagering on Olympic events, an animal shelter that names each of the pets after an American Olympic athlete because that faciliates adoptions, or a Korean consulate attempting to extend diplomatic good will? Which of these activities, products, or services falls satisfactorily within the meaning, function, or purpose of the sign so as to meet the exception? More importantly, who decides? The Tennessee official decides.

This brings us back around to Tennessee's argument that *nothing* at the Crossroads Ford billboard location could satisfy the exception because *nothing* happens there; it is a vacant lot. But rather than render the scheme content-neutral, that redoubles the importance of the content of the message. Suppose the sign said: "vacant lot, lots of vacancy," "free air—stop and enjoy some," or "fill wanted." Those messages might or could be the lot's activities, products, or services.

Tennessee contends that the Billboard Act's on-premises exception is not content-based because the operative distinction is "between signs that are related to the property on which they are located and those which are not . . . [meaning] the on-premise[s] exception distinguishes between signs based on their location, and not their content." That is, the content of the message is irrelevant; all that matters is its location—*signs can say whatever they want so long as they are in the correct location*. But Tennessee's argument is specious: whether the Act limits on-premises signs to only certain messages or limits certain messages from on-premises locations, the limitation depends on the content of the message. It does not limit signs from or to locations

regardless of the messages—those would be the (content-neutral) limitations that would fit its argument.

Even if Tennessee were correct, this "location" argument would simply trade one problem for another: instead of discriminating against the signs' messages, the Act would discriminate against the speaker. A law that allows a message but prohibits certain speakers from communicating that message is content-based. *See Turner*, 512 U.S. at 658 ("[S]peaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)."); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 193-94 (1999) ("Even under the degree of scrutiny that we have applied in commercial speech cases, [regulations] that select among speakers conveying virtually identical messages are in serious tension with the principles undergirding the First Amendment.").

Tennessee cites language from *Reed*, 135 S. Ct. at 2227, that the law in question there "depend[ed] entirely on the communicative content of the sign," for its argument that *Reed* means that a law is content-based only if it "depends entirely" on the content of a message. But that language was a factual statement describing the defendant's municipal code, not part of *Reed*'s analysis or holding. In any event, the Supreme Court has repeatedly held that laws combining content-based and content-neutral factors are nonetheless content-based. *See Mosley*, 408 U.S. at 98 (holding a law was content-based where it prohibited nonlabor-related picketing at a place of employment); *Carey v. Brown*, 447 U.S. 455, 460 (1980) (same); *Boos v. Barry*, 485 U.S. 312, 319 (1988) (holding a law was content-based where it prohibited speech critical of a foreign government within 500 feet of that government's embassy). In fact, in those cases, the Court used the same or similar "depends entirely" language to describe a necessarily content-based component even though it was combined with a content-neutral one. *See*, *e.g.*, *Boos*, 485 U.S. at 318 (holding that restriction "depends entirely upon whether [the] signs are critical of the foreign government"). The Act's on-premises exception employs a similar conjunctive binary of location and purpose: a sign must meet *both* prongs to qualify. Either can render the whole provision content-based.

Tennessee also argues that an otherwise content-based law is content-neutral if the State's justifications for that law are content-neutral, relying on *Wheeler v. Commissioner of Highways*, 822 F.2d 586, 590–94 (6th Cir. 1987), in which we considered a similar challenge to Kentucky's identical billboard law and held that it was not content-based because Kentucky's justifications were content-neutral.  But *Reed* established that the State's justifications or motivations are relevant only if the law appears facially content-neutral:

> A law that is content-based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech. . . . That is why we have repeatedly considered whether a law is content-neutral on its face *before* turning to the law's justification or purpose.

*Reed*, 135 S. Ct. at 2228 (quotations and citations omitted).  In fact, *Reed* criticized the same argument Tennessee makes now: "The Court of Appeals . . . misunderstand[s] our decision in *Ward* as suggesting that a government's purpose is relevant even when a law is content-based on its face. That is incorrect."  *Id.*  Rather, while "a content-based purpose may be sufficient" to transform a facially content-neutral law into one that is content-based, "an innocuous justification cannot transform a facially content-based law into one that is content-neutral."  *Id.* (citation omitted).  Simply put, *Reed* overruled *Wheeler*, which is no longer good law.

Finally, Tennessee would have us reconstruct the *Reed* decision by engaging in a form of speculative vote-counting.  All nine Justices joined the judgment in *Reed*, but three concurred in the judgment only, with Justice Kagan opining that she would have applied intermediate scrutiny, *id.* at 2238 (Kagan, J.), and three concurred in Justice Alito's "few words of further explanation," in which he identified some examples of state regulations that would not be content-based, including one for "[r]ules distinguishing between on-premises and off-premises signs."  *Id.* at 2233 (Alito, J.).  Tennessee pounces on this example and contends that the three Justices who joined Justice Alito would find an on/off-premises distinction content-neutral, as would the three who joined Justice Kagan—ergo, six of the nine Justices would find an on/off-premises distinction content-neutral.  The district court appropriately made quick work of this argument:

> This Court agrees it is possible for a restriction that distinguishes between off- and on-premises signs to be content-neutral. For example, a regulation that defines an off-premise[s] sign as any sign within 500 feet of a building is content-neutral. But if the off-premises/on-premises distinction hinges on the content of the message, it is not a content-neutral restriction. A contrary finding would read Justice Alito's concurrence as disagreeing with the majority in *Reed*. The Court declines such a reading. Justice Alito's exemplary list of "some rules that would not be content-based" ought to be read in harmony with the majority's holding. [] Read in harmony with the majority, Justice Alito's concurrence enumerates an 'on-premises/off-premises' distinction that is not defined by the sign's content, but by the sign's physical location or other content-neutral factor.

*Thomas*, 248 F. Supp. 3d at 879. There might be many formulations of an on/off-premises distinction that are content-neutral, but the one before us is not one of them.

Tennessee's Billboard Act contains a non-severable regulation of speech based on the content of the message. Applied to Thomas's billboard, it is, therefore, a content-based regulation of non-commercial speech, which subjects it to strict scrutiny. *See Reed*, 135 S. Ct. at 2226–27.

### D.  Strict Scrutiny

For a content-based restriction of non-commercial speech to survive strict scrutiny, the State must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quotation omitted). Because the on-premises exception is not severable from the Billboard Act, we must consider the Act as a whole and analyze both Tennessee's interests and precisely how Tennessee has tailored the Act to achieve those interests.

### 1.  Compelling State Interests

Tennessee proffers three "compelling state interests": public aesthetics, traffic safety, and safeguarding the constitutional rights of property owners. Tennessee furthers its interests in aesthetics and traffic safety through enforcement of the Billboard Act and the Act's general prohibition of signage. Tennessee pursues its interests in safeguarding the constitutional rights of property owners through the Billboard Act's exceptions, including the on-premises exception.

In *Reed*, 135 S. Ct. at 2231, the Court "assum[ed] for the sake of argument that [aesthetic appeal and traffic safety] are compelling governmental interests."  In *Wagner*, 675 F. App'x at 607, we decided to "follow the Court's example in *Reed* and assume without deciding that [aesthetic appeal and traffic safety] are sufficiently compelling."

But the Supreme Court has repeatedly found a State's interest in public aesthetics to be only "substantial" (rather than compelling), which is the interest level of intermediate scrutiny. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 425–29 (1993).  Tennessee concedes that no court has ever found public aesthetics to be a *compelling* interest and presents no persuasive arguments for finding that it is, but nonetheless urges us to break new ground.  We decline to do so.

Traffic safety presents a different scenario.  In the Fourth Amendment context, the Supreme Court has recognized a compelling interest in "highway safety," *Mackey v. Montrym*, 443 U.S. 1, 19 (1979) (upholding a Massachusetts "implied consent" law for breathalyzer tests), and we have done likewise, *see Tanks v. Greater Cleveland Reg'l Transit Auth.*, 930 F.2d 475, 479–80 (6th Cir. 1991) (upholding an Ohio law requiring public bus drivers to submit to randomized drug tests).  But neither the Supreme Court nor this court has issued any such holding in the First Amendment context.  We would, again, be breaking new ground and decline to do so.

As an aside, the Court has held elsewhere (under intermediate scrutiny) that the State must show that its justifications for a restrictive law are "genuine [and] not hypothesized or invented *post-hoc* in response to litigation."  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  Here, we have persuasive evidence that Congress in enacting the HBA, and in turn Tennessee in enacting the Billboard Act, were motivated almost exclusively by aesthetic, not public safety, concerns.  *See Brief for the Buckeye Institute as Amicus Curiae in Support of Appellee*, pgs. 4–11.  Moreover, exceptions "diminish the credibility of the government's rationale for restricting speech in the first place."  *Gilleo*, 512 U.S. at 52.  The Billboard Act's ready exceptions, *see* T.C.A. §§ 54-21-103(4)-(5); -104; -107, undermine Tennessee's professed concern for traffic safety by allowing significant commercial signage that serves Tennessee's economic interests, which Tennessee concedes are not compelling.  And, we note that, despite

"[a]ssuming for the sake of argument," that traffic safety is a compelling interest, the Court in *Reed*, 135 S. Ct. at 2231-32, nonetheless concluded that restrictions on non-commercial signs were not "justified by traditional safety concerns."

Finally, Tennessee argues that it has a compelling interest in safeguarding the constitutional rights of business and property owners, namely their First Amendment rights, through the on-premises exception to the Billboard Act. It is undoubtedly true that a State's interest in complying with its constitutional obligations is compelling. *Widmar v. Vincent*, 454 U.S. 263, 271 (1981). Thomas concedes this point but objects to Tennessee's raising the argument here, protesting that Tennessee forfeited the issue by not raising it clearly to the district court. We agree—and Tennessee admits—that Tennessee could have done a better job of addressing this issue to the district court, but we proceed as if Tennessee sufficiently raised the issue and preserved it for appeal. *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009).

## 2. *Narrowly Tailored*

To establish that a law regulating or restricting speech is narrowly tailored, "the Government carries the burden of showing that the challenged regulation advances the Government's [compelling] interest in a direct and material way." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (quotation omitted). While the regulation need not be perfectly tailored, the State's burden is not carried if the regulation "provides only ineffective or remote support" of the claimed compelling interest. *Greater New Orleans*, 527 U.S. at 188 (quotation omitted).

In *Metromedia*, 453 U.S. at 503, the Court addressed a billboard ordinance similar to Tennessee's Billboard Act. Under that ordinance:

> a sign advertising goods or services available on the property where the sign is located is allowed; [but] a sign on a building or other property advertising goods or services produced or offered elsewhere is barred; [and] non-commercial advertising, unless [relating to the premises], is everywhere prohibited. The occupant of property may advertise his own goods or services; he may not advertise the goods or services of others, nor may he display most non-commercial messages.

*Id.* Finding the ordinance unconstitutional as applied to non-commercial speech, a divided court rendered a four-Justice plurality opinion, a two-Justice concurrence in the judgment only, and three separate dissents, each agreeing with different aspects of the plurality opinion or concurrence. *Id.* Later, in another First Amendment challenge to a sign ordinance, the Court affirmed both the plurality and concurrence as "two analytically distinct grounds for challenging the constitutionality of [an ordinance] regulating the display of signs." *Gilleo*, 512 U.S. at 50.

The first ground is if the law is overinclusive. *Metromedia*, 453 U.S. at 521-39 (Brennan, J., concurring in the judgment only). A content-based law regulating speech is overinclusive if it implicates more speech than necessary to advance the government's interests. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991). "[S]uch provisions are subject to attack on the ground that they simply prohibit too much protected speech." *Gilleo*, 512 U.S. at 51. "To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 538 (1980); *see also Jamison v. Texas*, 318 U.S. 413, 416 (1943) (holding invalid the total prohibition of handbills on the public streets); *Martin v. City of Struthers*, 319 U.S. 141, 145–149 (1943) (holding invalid the total prohibition of door-to-door distribution of literature); *but see City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 807 (1984) (upholding a total prohibition of signage attached to utility poles). To survive an overinclusiveness challenge, the State must both meet the requisite tailoring requirements and "leave open ample alternative channels for communication" of the affected speech. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

The second ground is if the law is underinclusive. *Metromedia*, 453 U.S. at 512-17 (White, J., plurality). This type of challenge is generally appropriate when a regulation functions "through the combined operation of a general speech restriction and [selected] exemptions." *Gilleo*, 512 U.S. at 51. Such a law is problematic "because its exemptions discriminate on the basis of the signs' messages." *Id.* By picking and choosing which subjects or speakers are exempted, the government may "attempt to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat. Bank v. Bellotti*, 435 U.S. 765, 785

(1978).  The underinclusiveness of a law can be cured by either eliminating the exemptions such that all speech is treated equally or expanding the exemptions to include more protected speech. *See Metromedia*, 453 U.S. at 513-15 (plurality).

Although Thomas makes both overinclusiveness and underinclusiveness arguments, his challenge is more appropriately one of underinclusiveness.  Most obviously, the Billboard Act's "operation of a general speech restriction and [selected] exemptions" clearly lends itself to such an examination.  *See Gilleo*, 512 U.S. at 51.  Notably, the ordinance in *Metromedia* would have required the removal of long-standing billboards and the parties jointly stipulated that billboards had long been "an effective medium of communication" and "other forms of advertising [were] insufficient, inappropriate, and prohibitively expensive."  *Metromedia*, 453 U.S. at 525-26 (concurrence).  Those stipulated facts were central to the concurrence's finding that an overinclusiveness challenge was the "appropriate analytical framework to apply."  *Id*. at 525. That dynamic is not present here—indeed there is no broad reliance interest at stake nor does Thomas argue, or Tennessee concede, that billboards are necessary media for non-commercial speech.

Because, as applied in this case, the exception is the restriction, we must consider whether the exception is sufficiently expansive to save constitutionally protected speech from the Act's effective prohibition.  *See Metromedia*, 453 U.S. at 520.  If not, then the "exemptions discriminate on the basis of the signs' messages," and the Act is an underinclusive restriction on speech. *See Gilleo*, 512 U.S. at 51.  We find the Act underinclusive in two ways.

First, the Act discriminates among non-commercial messages on the basis of content. Consider a hypothetical.  A crisis pregnancy center erects a sign on its premises that says: "Abortion is murder!"  Such a sign would presumably qualify for the on-premises exception because the message is related to the activities, goods, and services at the center.  But may the property owner next door, who provides no services related to abortion, erect a sign that says: "Keep your laws off of my body!"?  Under the Billboard Act, no.  Two identically situated signs about the same ideological topic—one sign/speaker/message is allowed; the other is not.

By favoring on-premises-related speech over speech on but unrelated to the premises, the Billboard Act "has the effect of disadvantaging the category of non-commercial speech that is probably the most highly protected: the expression of ideas." *Ackerley Commc'ns. of Mass., Inc. v. City of Cambridge*, 88 F.3d 33, 37 (1st. Cir. 1996). That Tennessee favors speech related to the premises—intentionally or not—"does not justify prohibiting an occupant from displaying its own ideas. . . . Although the [State] may distinguish between the relative value of different categories of commercial speech, the [State] does not have the same range of choice in the area of non-commercial speech to evaluate the strength of, or distinguish between, various communicative interests." *Metromedia*, 453 U.S. at 513-15 (plurality). "The First Amendment's guarantee of free speech does not extend only to categories of speech that survive [the State's] *ad hoc* balancing of relative social costs and benefits." *United States v. Stevens*, 559 U.S. 460, 470 (2010).

The Billboard Act is underinclusive also because it discriminates against *non-commercial* speech on but unrelated to the premises while allowing on-premises *commercial* speech. Consider another scenario. A pet store that sources its dogs from a notorious puppy mill erects a sign on its premises that says: "We have the most dogs around—and can always pump out more! Come get one!" Such a sign would presumably qualify for the on-premises exception because the message is related to the on-premises commercial activity of the pet store. But may the property owner across the street, who offers no services regarding animals, erect an otherwise identical sign that says: "Puppy Mills are Animal Cruelty!"? Under the Billboard Act, no. Yet, in this instance, the speech that would be allowed is unsettling commercial advertising while the speech prohibited is non-commercial protest. This contradicts established First Amendment caselaw, which "ha[s] consistently accorded non-commercial speech a greater degree of protection than commercial speech." *Metromedia*, 453 U.S. at 513 (plurality).

> Insofar as the [State] tolerates billboards at all, it cannot choose to limit their content to commercial messages; the [State] may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of non-commercial messages.

*Id.* (plurality). That Tennessee allows some so-called "on-premises non-commercial speech" does not save it from this conclusion.

> The rule against content discrimination forces the government to limit all speech—including speech the government does not want to limit—if it is going to restrict any speech at all. By deterring the government from exempting speech [that] the government prefers, the Supreme Court has helped to ensure that [the] government only limits any speech when it is quite certain that it desires to do so.

*Rappa v. New Castle County*, 18 F.3d 1043, 1063 (3d Cir. 1994). By placing a burden "more heavily on ideological than on commercial speech" the Billboard Act represents "a peculiar inversion of First Amendment values." *John Donnelly & Sons v. Campbell*, 639 F.2d 6, 15-16 (1st Cir. 1980) (finding Maine billboard law underinclusive of non-commercial speech).

Our review of the record and the language of the Billboard Act leads to one more inescapable conclusion: the on-premises exception is tailored to promote Tennessee's economic interests. Of all possible speech, the on-premises exception allows for signage that communicates messages that encourage commercial patronage. Tennessee argues that this is sufficient First Amendment protection—*property owners can choose to say whatever they want, so long as their messages relate to the activities, goods, or services at the premises*—which reminds us of Henry Ford's famous quip about options for the original Model T: "Customers can choose any color they want, so long as it is black." That there is some overlap between what the on-premises exception allows and what property owners may choose to communicate does not mean that Tennessee is safeguarding its citizens' First Amendment rights. Because the Billboard Act is "hopelessly underinclusive," it is not narrowly tailored to further a compelling interest and thus is an unconstitutional restriction on non-commercial speech. *See Reed*, 135 S. Ct. at 2231.

### E. Tennessee's Policy Arguments

Tennessee also presses two policy concerns as if they were legal arguments. First, Tennessee urges us to pay special attention to the practical distinction between billboards and signs, and include that in our analysis. The Billboard Act and its attendant regulations cover all signs near public roadways regardless of whether those signs are situated on the ground, mounted on business or residential buildings, or affixed to billboard bases. The Act also regulates billboard bases as structures, imposing certain size, spacing, lighting, and safety

requirements.    Tennessee complains that it will not be able to enforce these content-neutral regulations of billboard bases if we affirm the district court.  Second, Tennessee complains that if the on-premises exception is unconstitutional, then it is henceforth powerless to regulate even commercial signage.

As the district court explained, these are problems for the Tennessee Legislature, not the courts.  *Thomas*, 2017 WL 6489144, at *5.  Indeed, in the wake of *Reed*, state legislatures and municipal governments have begun to preemptively cure their signage regulations to satisfy the First Amendment.  *See, e.g.,* Indianapolis, Ind. Code § 734 (Amended, Nov. 30, 2015); Ind. Code § 734-501(b) (amending definitions of on-premises, off-premises, and advertising signs to clarify that the limitations "[do] not apply to the content of noncommercial messages"); *Geft Outdoor LLC v. Consol. City of Indianapolis and Cnty. of Marion, Ind.*, 187 F. Supp. 3d 1002, 1009 (S.D. Ind. 2016) (noting that the city brought its regulations "into compliance with *Reed*"); *see also* Tex. Transp. Code § 391.031, Tex. S.B. 2006, 85th Leg., ch. 964 (S.B. 2006), §§ 6, 7, 33(3), eff. June 15, 2017 (changing the prohibition from "outdoor advertising" to only "commercial signs").

Tennessee is free to regulate the erection and attributes of billboard bases—and all other content-neutral aspects of signs—provided that it does so without unconstitutional reference to the content of the signage affixed to those billboard bases.  Nothing in this opinion disturbs that longstanding principle, which the Court affirmed in *Reed*, 135 S. Ct. at 2232.  But Tennessee's policy considerations are irrelevant to the constitutional matter before this court.

### III.  CONCLUSION

The district court determined that the Tennessee Billboard Act, as effectuated here by its non-severable on-premises exception, is a content-based regulation of free speech that cannot survive strict scrutiny and is, therefore, unconstitutional.  For the reasons stated in the district court's opinions and those elaborated upon herein, we find that we agree and must AFFIRM.