# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 25, 2020

Lyle W. Cayce
Clerk

No. 19-50354

Reagan National Advertising of Austin, Incorporated,

*Plaintiff—Appellant*,

Lamar Advantage Outdoor Company, L.P., *doing business as* The Lamar Companies,

*Intervenor Plaintiff—Appellant*,

*versus*

City of Austin,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-673

Before Elrod, Southwick, and Haynes, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

Reagan National Advertising of Austin and Lamar Advantage Outdoor Company both filed applications to digitize existing billboards. The City of Austin denied the applications because its Sign Code does not allow the digitization of off-premises signs. Reagan and Lamar sued, arguing that the Sign Code's distinction between on-premises and off-premises signs

violates the First Amendment. The Sign Code's on-premises/off-premises distinction is content based and therefore subject to strict scrutiny. Because the Sign Code cannot withstand this high bar, we REVERSE and REMAND.

I.

Plaintiffs-Appellants Reagan and Lamar are in the business of outdoor advertising. Reagan and Lamar own and operate "off-premise[s]" signs, including billboards that display both commercial and noncommercial messages.

In April and June 2017, Reagan submitted permit applications to digitize its existing "off-premises" sign structures. The City denied all the permit applications, stating that "[t]hese applications cannot be approved under Section 25-10-152 (*Nonconforming Signs*) because they would change the existing technology used to convey off-premises commercial messages and increase the degree of nonconformity with current regulations relating to off-premises signs." In June 2017, Lamar submitted permit applications to digitize its existing "off-premises" sign structures. The City denied Lamar's applications for the same reasons it denied Reagan's.

The City of Austin regulates signs in Chapter 25-10 of the Austin City Code. The Sign Code defines an "off-premise[s] sign" as "a sign advertising a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that directs persons to any location not on that site." The Sign Code does not expressly define "on-premise[s] sign," but it does use the term "on-premise[s] sign" in some of its provisions. The Sign Code allows new on-premises signs to be built, but it does not allow new off-premises signs to be built. A "nonconforming sign" is defined as "a sign that was lawfully installed at its current location but does not comply with the

requirements of [the Sign Code.]" Preexisting off-premises signs are deemed "nonconforming signs."

Persons are permitted to "continue or maintain nonconforming signs at [their] existing location," and can even change the face of the nonconforming sign, as long as the change does not "increase the degree of the existing nonconformity." However, persons are not permitted to "change the method or technology used to convey a message" on a nonconforming sign. The Sign Code permits "on-premise[s] signs" to be "electronically controlled changeable copy signs" (*i.e.*, "digital signs"). Consequently, on-premises non-digital signs can be digitized, but off-premises non-digital signs cannot. The City's stated general purpose in adopting the Sign Code is to protect the aesthetic value of the city and to protect public safety.

In June 2017, Reagan sued the City in state court alleging the Sign Code was unconstitutional. Specifically, it alleged that the distinction between the digitalization of on-premises and off-premises signs was a violation of the First Amendment. In July 2017, the City removed the case to federal court.

In August 2017, the City amended the Sign Code. The amended Sign Code defines "off-premise[s] sign" as "a sign that displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution, or other commercial message which is generally conducted, sold, manufactured, produced, offered, or occurs elsewhere than on the premises where the sign is located," and it expressly defines an "on-premise[s] sign" as "a sign that is not an off-premise[s] sign."

The amended Sign Code also includes a new section, "§ 25-10-2 - Noncommercial Message Substitution," comprised of the following provisions:

(A) Signs containing noncommercial speech are permitted anywhere that signs regulated by this chapter are permitted, subject to the same regulations applicable to the type of sign used to display the noncommercial message. No provision of this chapter prohibits an ideological, political, or other noncommercial message on a sign otherwise allowed and lawfully displayed under this chapter.

(B) The owner of any sign allowed and lawfully displayed under this chapter may substitute noncommercial speech in lieu of any other commercial or noncommercial speech, with no permit or other approval required from the City solely for the substitution of copy.

(C) This section does not authorize the substitution of an off-premise[s] commercial message in place of a noncommercial or on-premise[s] commercial message.

The amendments do not change the prohibition on changing the method or technology used to convey messages (*e.g.*, digitalization) for nonconforming signs, Section 25-10-152, or the definition of "nonconforming sign."

In October 2017, Lamar joined the case as an intervenor plaintiff. In their amended complaints, Reagan and Lamar asserted nearly identical causes of action and requests for relief. They sought declaratory judgments that the Sign Code's distinction between on-premises and off-premises signs was an unconstitutional content-based speech restriction, that the Sign Code was invalid and unenforceable, and that Reagan and Lamar should be allowed to digitize their signs without permits. Reagan sought a declaratory judgment that the Sign Code was invalid as applied to Reagan, but Lamar did not seek this specific relief.

After a bench trial, the district court denied Reagan and Lamar's requests for declaratory judgment, held that the Sign Code was content neutral and satisfied intermediate scrutiny, and entered judgment for the City. Reagan and Lamar appeal.

No. 19-50354

## II.

The first issue we must address is mootness. In August 2017, the City amended the Sign Code. The impact of the amendment was two-fold. First, it amended the definition of "off-premise[s] sign" and expressly defined "on-premise[s] sign." Second, it included a new section on "noncommercial message substitution." The amendment did not alter the prohibition on changing the method or technology used to convey messages for nonconforming signs (*e.g.*, digitalization) or the definition of a nonconforming sign.

The district court *sua sponte* addressed the question of mootness because the Sign Code amendments occurred after the denial of Reagan and Lamar's applications. The district court reasoned that amendments to a challenged law are not enough to moot an underlying claim unless the law has been sufficiently altered so as to present a substantially different controversy. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 & n.3 (1993).

The district court determined that the amendments to the Sign Code did not present a substantially different controversy because they: (1) did not alter the prohibition against new digital sign-faces for billboards; and (2) did not change Reagan and Lamar's claim that the application of the Sign Code required an enforcer to read the sign to determine whether it was "on-premises" or "off-premises," and thus, in Reagan and Lamar's view, the post-amendment Sign Code was still content based.

Reagan and Lamar agree with the district court that their case is not moot. However, they disagree on the why. Reagan and Lamar sought to update grandfathered signs, and they filed their applications to do so in April 2017 and June 2017. At that time, the prior version of the Sign Code was still in effect and Reagan and Lamar's applications were denied under the prior

No. 19-50354

version of the Code. Therefore, they assert that under Texas law, they have the right to have their applications determined based on the regulations in effect at the time their applications were filed. Tex. Loc. Gov't Code Ann. § 245002(a)(1); *see Reagan Nat. Advert. of Austin, Inc. v. City of Cedar Park*, 387 F. Supp. 3d 703, 706 n.3 (W.D. Tex. 2019) ("Texas law requires the permit applications be evaluated under the law as it existed at the time they were submitted, rather than under the new, revised sign code.").

We agree with Reagan and Lamar; the case is not moot. As Reagan and Lamar applied for permits under the old ordinance, we evaluate the constitutionality of the previous version of the ordinance.[1]

III.

There are two substantive issues we must address to determine what standard of scrutiny applies to Austin's Sign Code. First, whether the Sign Code's distinction between on-premises and off-premises signs is content based and second, whether the Sign Code is a regulation of commercial speech and therefore subject to intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 561 (1980). We hold that because the Sign Code is a content-based regulation that is not subject to the commercial speech exception, strict scrutiny applies, and the City has not satisfied that standard. We walk through this analysis below.

A.

We turn first to whether the Sign Code's distinction between "on-premises" and "off-premises" signs is a content-based or content-neutral distinction. If the distinction is content based, then it is "presumptively unconstitutional" and subject to strict scrutiny. *Reed v. Town of Gilbert*, 576

---

[1] We therefore do not need to address the amended ordinance's constitutionality.

U.S. 155, 163 (2015). If the Sign Code is content neutral, then it is subject to intermediate scrutiny. *Id.* Because an off-premises sign is determined by its communicative content, we hold that the Sign Code's distinction between on-premises and off-premises signs is content based.

In 2015, the Supreme Court decided *Reed v. Town of Gilbert*, which clarified the law surrounding content-based speech regulations. Justice Thomas, writing for the majority, explained that a law is content based when it "target[s] speech based on its communicative content," or in other words, when it "applies to particular speech because of the topic discussed or the idea or message expressed. *Id.* To determine whether a law is content based, *Reed* states that a court must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* It may be the case that a distinction "defining regulated speech by its function or purpose" is drawn based on the message the speaker conveys and is thus facially content based and subject to strict scrutiny. *Id.*

*Reed* held that if a law is facially content based, it is "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). For this reason, a court must consider whether a law is facially content based or content neutral "*before* turning to the law's justification or purpose." *Id.* at 166.

While *Reed* did not profess to be creating new First Amendment law, federal courts have recognized that *Reed* constituted "a drastic change in First Amendment jurisprudence." *Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 825 F.3d 149, 160 n.7 (3d Cir. 2016); *see also Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1332–33 (11th Cir. 2017) (en banc) (Tjoflat, J., dissenting) ("*Reed* announced a sea change in the traditional test for content

neutrality under the First Amendment, and, in the process, expanded the number of previously permissible regulations now presumptively invalid under strict scrutiny."); *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015) ("*Reed* has made clear that, at the first step, the government's justification or purpose in enacting the law is irrelevant.").

Given this "sea change," other circuits have had to assess their pre-*Reed* case law. The Third and Fourth Circuits, recognizing that *Reed* conflicted with their prior precedent, both abrogated certain pre-*Reed* cases. *See Free Speech Coalition*, 825 F.3d at 149 (explaining that *Reed* "requires us to take another look at our holding that intermediate scrutiny applies to the First Amendment analysis"); *Cahaly*, 796 F.3d at 405 ("This formulation conflicts with, and therefore abrogates, our previous descriptions of content neutrality . . . ."). The Sixth and Seventh Circuits have also acknowledged the impact of *Reed* in cases before them on rehearing. *See Wagner v. City of Garfield Heights*, 675 F. App'x 599 (6th Cir. 2017) (revisiting prior decision on remand from the Supreme Court after *Reed*); *Norton v. City of Springfield*, 806 F.3d 411 (7th Cir. 2015) (reversing a prior holding, on petition for rehearing, based on *Reed*).

This circuit has yet to take inventory of our pre-*Reed* cases.[2] We do so now. We had previously held that "[a] statute that appears content-based on its face may still be deemed content-neutral if it is justified without regard to the content of the speech . . . . Content-neutrality has continued to be defined by the justification of the law or regulation, and this court has

---

[2] This is not the first instance since 2015 that this court has cited to *Reed*. Several of our cases have cited *Reed*, but not for the direct proposition at issue here. *See Seals v. McBee*, 898 F.3d 587, 595 (5th Cir. 2018); *United States v. Petras*, 879 F.3d 155, 166–67 (5th Cir. 2018); *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 468–69 (5th Cir. 2016) (Jones, J., dissenting).

consistently employed that test." *Asgeirsson v. Abbott*, 696 F.3d 454, 459–60 (5th Cir. 2012) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration." (citation omitted))). The *Asgeirsson* case predates *Reed* and cites to *Ward*, which the Supreme Court addressed in *Reed*.

While the Supreme Court did not overturn *Ward* in *Reed*, it did explain that the Ninth Circuit, who had interpreted *Ward* just as this court had in *Asgeirsson*, "misunderst[ood] [the] decision in *Ward* as suggesting that a government's purpose is relevant even when a law is content based on its face." *Reed*, 576 U.S. at 166. The Supreme Court explained: "That is incorrect. *Ward* had nothing to say about facially content-based restrictions because it involved a facially content-*neutral* ban . . . ." *Id.* at 166–67. It went on to clarify the correct law:

> Our precedents have . . . recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be "justified without reference to the content of the regulated speech," or that were adopted by the government "because of disagreement with the message [the speech] conveys." Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

*Id.* at 164 (alteration in original) (quoting *Ward*, 491 U.S. at 791). But, if a law is content based on its face, then it is "subject to strict scrutiny regardless of the government's . . . content-neutral justification." *Id.* at 165.

In the wake of *Reed*, our *Asgeirsson* precedent must be revisited. Like the Ninth Circuit, our pre-*Reed* case law ascribed to an incorrect understanding of the test for content-neutrality given in *Ward*. *See Asgeirsson*,

696 F.3d at 459–60. Therefore, *Asgeirsson* and any portion of a case that relies on *Asgeirsson*'s content-neutrality analysis must be abrogated.[3]

Having clarified our case law, we now return to the case at bar and consider whether the challenged ordinance is content neutral or content based. *Reed* serves as our guide.

All nine Justices concurred in the judgment in *Reed*, six joining fully in the majority opinion and three concurring in the judgment only and proffering instead that intermediate scrutiny should have applied. *Reed*, 576 U.S. at 179 (Kagan, J., concurring in the judgment). Justice Alito, joined by Justices Kennedy and Sotomayor, all of whom concurred fully in the majority opinion, wrote a "few words of further explanation" in which he cautioned against the potential breadth of the majority opinion by discussing certain types of regulations that would still be content neutral under the opinion's holding. *Id.* at 174 (Alito, J., concurring). Justice Alito specifically notes, without further explanation, that "[r]ules distinguishing between on-premises and off-premises signs" should not be considered content based. *Id.* at 175 (Alito, J., concurring).

The City cites to Justice Alito's concurrence as support for its position that the type of regulation here is not content based and is simply

---

[3] *See, e.g.*, *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 510 (5th Cir. 2009); *Pruett v. Harris Cty. Bail Bond Bd.*, 499 F.3d 403, 409 n.5 (5th Cir. 2007); *Illusions–Dall. Private Club, Inc. v. Steen*, 482 F.3d 299, 308 (5th Cir. 2007); *Fantasy Ranch Inc. v. City of Arlington*, 459 F.3d 546, 554–56 (5th Cir. 2006); *Brazos Valley Coal. for Life, Inc. v. City of Bryan*, 421 F.3d 314, 326–27 (5th Cir. 2005); *de la O v. Hous. Auth. of City of El Paso*, 417 F.3d 495, 503 (5th Cir. 2005); *N.W. Enters. Inc. v. City of Houston*, 352 F.3d 162, 174 (5th Cir. 2003); *Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 292 (5th Cir. 2003); *Horton v. City of Houston*, 179 F.3d 188, 193 (5th Cir. 1999).

exempted from *Reed*. But we do not agree that Justice Alito's concurrence supports the City. Like the Sixth Circuit, we

> agree[] it is possible for a restriction that distinguishes between off-and on-premises signs to be content-neutral. For example, a regulation that defines an off-premise[s] sign as any sign within 500 feet of a building is content-neutral. But if the off-premises/on-premises distinction hinges on the content of the message, it is not a content-neutral restriction. A contrary finding would read Justice Alito's concurrence as disagreeing with the majority in *Reed*. The Court declines such a reading. Justice Alito's exemplary list of "some rules that would not be content-based" ought to be read in harmony with the majority's holding. [ ] Read in harmony with the majority, Justice Alito's concurrence enumerates an 'on-premises/off-premises' distinction that is not defined by the sign's content, but by the sign's physical location or other content-neutral factor.

*Thomas v. Bright*, 937 F.3d 721, 732–33 (6th Cir. 2019) (Batchelder, J.) (alteration in original) (quoting *Thomas v. Schroer*, 248 F. Supp. 3d 868, 879 (W.D. Tenn. 2017)); *see also* Note, *Free Speech Doctrine after* Reed v. Town of Gilbert, 129 Harv. L. Rev. 1981, 1993 (2016) (explaining the potential "inconsistency between the *Reed* majority's far-ranging reasoning and Justice Alito's attempt to identify exceptions"). The City's Sign Code must be evaluated under the clear rule set forth by the *Reed* majority.

Austin's Sign Code permits on-premises sign owners to install digital sign faces that allow the copy to be changed electronically, while off-premises sign owners are forbidden from using this technology. To determine whether a sign is on-premises or off-premises, one must read the sign and ask: does it advertise "a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that directs persons to any location not on that site"? The City claims that this is not a regulation over a

sign's content; rather, it is a time, place, or manner restriction based on the location of signs. But "whether the Act limits on-premises signs to only certain messages or limits certain messages from on-premises locations, the limitation depends on the content of the message." *Thomas*, 937 F.3d at 731.

The Sixth Circuit recently decided a nearly identical question. In *Thomas v. Bright*, the court considered an "on-premises exception allow[ing] a property owner to avoid the permitting process and proceed to post a sign without any permit, so long as the sign is 'advertising activities conducted on the property on which [the sign is] located.'" *Id.* at 730 (second alteration in original) (quoting Tenn. Code Ann. § 54-21-103(3)). The enabling regulation specified that the sign had to be "located on the same premises as the activity" and "have as its purpose the identification of the activity, products, or services offered on that same premises." *Id.* (alterations omitted) (quoting Tenn. Comp. R. & Regs. 1680-02-03-.06)).

The Sixth Circuit explained that to determine whether the on-premises exception applied, the government official had to read the message written on the sign and determine its meaning, function, or purpose. *Id.* It wrote: "Some facial distinctions based on a message are obvious, . . . and others are more subtle, defining regulated speech by its *function or purpose*." *Id.* (quoting *Reed*, 576 U.S. at 163). Consequently, the Sixth Circuit held the challenged regulation "contains a non-severable regulation of speech based on the content of the message." *Id.* at 733.

The D.C. Circuit has interpreted *Reed* differently. *See Act Now to Stop War and End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 404 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 334 (2017). In *Act Now*, the D.C. Circuit concluded that a distinction between event-related signs and those not related to an event was content neutral because it was "not a 'regulation of speech,' but a 'regulation of the places

where some speech may occur.'" 846 F.3d at 403 (quoting *Hill v. Colorado*, 530 U.S. 703, 719 (2000)).

The D.C. Circuit reasoned that even though government "officials may look at what a poster says to determine whether it is 'event-related,'" that did "not render the District's [regulation] content-based," and "the fact that a [government] official might read a date and place on a sign to determine that it relates to a bygone demonstration, school auction, or church fundraiser does not make the [regulation] content based." *Id.* at 404. "[S]uch 'cursory examination' did not render the statute facially content based." *Id.* (quoting *Hill*, 530 U.S. at 720).

We do not see, as the D.C. Circuit does, an exception for mere "cursory" inquiries into content in the holding of *Reed*. But even if we did, the sign ordinance here does not depend on merely a cursory inquiry into content. The City of Austin advances this "cursory" test as well, but the distinction does not hold water. It takes no more than a cursory reading to figure out if a sign supports Candidate A or Candidate B. But a law allowing advertising for Candidate A and not Candidate B would surely be content based. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (explaining that viewpoint discrimination is a more "blatant" and "egregious" form of content-based discrimination).

Determining whether a sign is on-premises or off-premises is not a "cursory" inquiry under the circumstances here. At oral argument, the panel posed numerous hypotheticals to the City asking whether a certain sign would be on-premises or off-premises:

• Could Sally have a digital sign in her front yard that says "Sally makes quilts here and sells them at 3200 Main Street"?

- Could Barbara and Tom maintain a digital sign in their yard that says "We love hamburgers" that contained the logo and address to a Whataburger location two miles away?

- Could the local school have an electronic message board that rotated between messages that said "Finals Start Tuesday" and "Eat at the Main Street Café on Friday to Support the Boosters"?

- Could Sarah place a digital sign in her yard that said "Vote for Kathy" if Kathy did not live at Sarah's house?

- How could one determine whether a digital billboard that said "God Loves You" is on-premises or off-premises?

Counsel for the City struggled to answer whether these hypothetical signs were on-premises or off-premises. And if prepared counsel cannot quickly assess whether these signs are permitted under the Sign Code, the inquiry is not a mere cursory one. A reader must ask: who is the speaker and what is the speaker saying? These are both hallmarks of a content-based inquiry. *See Reed*, 576 U.S. 166–69. The fact that the reader must also ask, where is this sign located?—a content-neutral inquiry—does not save the regulation.

*Reed* reasoned that a distinction can be facially content based if it defines regulated speech by its function or purpose. Here, the Sign Code defines "off-premises" signs by their purpose: advertising or directing attention to a business, product, activity, institution, etc., not located at the same location as the sign. The City clams that it is not content based because it does not target one specific viewpoint or message, but the Sign Code does not need to discriminate against a specific viewpoint to be "content based."

As explained in *Reed*, "A regulation that targets a sign because it conveys an idea about a specific event is no less content based than a

regulation that targets a sign because it conveys some other idea." 576 U.S. at 171. Hence why the ordinance at issue in *Reed* was deemed content based; it "single[d] out signs bearing a particular message: the time and location of a specific event." *Id.*

Our sister circuits have recognized this important principle. In addition to the Sixth Circuit decision discussed above, consider *Norton v. City of Springfield*, a decision in which the Seventh Circuit struck down an anti-panhandling ordinance that prohibited asking for immediate donations but allowed requests for future donations. 806 F.3d at 412. Relying on *Reed*, the Seventh Circuit reasoned that the ordinance was content based. *Id.* at 413. It prohibited speech that said "Donate Now!" but allowed speech that said "Donate Later!" What time was to the anti-panhandling ordinance in *Norton*, location is to Austin's on-premises/off-premises distinction. Austin's Sign Code treats a sign that says "Stop Here!" differently than a sign that says "Stop Over There!"

We take *Reed* at its word. Recall that in *Reed*, the sign code required town officials to examine a sign to determine its purpose, and "[t]hat obvious content-based inquiry does not evade strict scrutiny review simply because an event . . . is involved." 576 U.S. at 170.

Or recall *Thomas*'s faithful application of *Reed*: The fact that a government official had to read a sign's message to determine the sign's purpose was enough to subject the law to strict scrutiny even though the sign's location was also involved. *Thomas*, 937 F.3d at 730–31 (explaining that the fact that Tennessee's law involved location did not make it content neutral because "the Supreme Court has repeatedly held that laws combining content-based and content-neutral factors are nonetheless content-based"). So here too. To determine whether a sign is "off-premises" and therefore unable to be digitized, government officials must read it. This is an "obvious

content-based inquiry," and it "does not evade strict scrutiny" simply because a location is involved.

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). "Content-based regulations of speech 'pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.'" *Wollschlaeger*, 848 F.3d at 1327 (Pryor, J., concurring) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). "The power of the state must not be used to 'drive certain ideas or viewpoints from the marketplace,' even if a majority of the people might like to see a particular idea defeated." *Id.* (Pryor, J., concurring) (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)).

The rule in *Reed* is broad, but this is not an unforeseen consequence. The separate opinions in *Reed* warned of just how broadly the rule could be interpreted. Justice Kagan's concurrence in *Reed* highlights the majority opinion's breadth by pointing out that the *Reed* majority opinion subjects signs advertising a one-time event to strict scrutiny because "a law with an exception for such signs 'singles out specific subject matter for differential treatment.'" 576 U.S. at 181 n.1 (Kagan, J., concurring in the judgment) (quoting 576 U.S. at 156, 169). Justice Breyer wrote that the *Reed* majority opinion cannot "avoid the application of strict scrutiny to all sorts of justifiable governmental regulations." *Id.* at 178 (Breyer, J., concurring in the judgment).

Indeed, the *Reed* majority itself acknowledged that "laws that might seem 'entirely reasonable' will sometimes be 'struck down because of their

content-based nature.'" *Id.* at 165 (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 60 (1994) (O'Connor, J., concurring)). As Justice Thomas explained, "[i]nnocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech. That is why the First Amendment expressly targets the operation of the laws—*i.e.*, the 'abridg[ement] of speech'—rather than merely the motives of those who enacted them." *Id.* at 167 (alteration in original) (quoting U.S. Const. amend. I).

For the foregoing reasons, we hold that Austin's on-premises/off-premises distinction is content based.

## B.

That still leaves the question of whether the Sign Code is regulating commercial speech. "Commercial speech is '[e]xpression related solely to the economic interests of the speaker and its audience.'" *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Prof'l Eng'rs & Surveyors*, 916 F.3d 483, 487 n.2 (5th Cir. 2019) (alteration in original) (quoting *Central Hudson*, 447 U.S. at 561). Prior to *Reed*, "commercial speech enjoy[ed] lesser, intermediate-scrutiny constitutional protection." *RTM Media, L.L.C. v. City of Houston*, 584 F.3d 220, 224 (5th Cir. 2009), *cert. denied*, 130 U.S. 644 (2010); *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507 (1981). We need not decide the issue of whether *Reed* changes the analysis of commercial speech unless Austin's Sign Code regulates only commercial speech.[4]

---

[4] The district court concluded that the lesser scrutiny outlined in *Central Hudson* and *Metromedia* applied because the Sign Code's "on/off-premises distinction is content neutral." This was error. Assuming *Reed* has not altered the law on commercial speech, courts do not apply the *Central Hudson* test to "content neutral" regulations, but to

So, does Austin's Sign Code regulate commercial speech? Commercial speech is protected by the First Amendment, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761–62 (1976), but *Central Hudson* dictates that commercial speech is given "lesser protection . . . than . . . other constitutionally guaranteed expression," 447 U.S. at 563. This is because commercial speech "serves the economic interest of the speaker." *Id.* at 561. While the Supreme Court has "rejected the . . . view that government has complete power to suppress or regulate commercial speech," *id.* at 562, there is no "constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity," *id.* at 563.

The parties do not dispute that the Sign Code, prior to the amendments, applied to both commercial and noncommercial speech. The relevant provisions made no exceptions or carve outs to the applicability of the law based on whether the speech involved commercial or noncommercial messages. Notwithstanding the law's general applicability, the City argues that because the Sign Code applies to billboards, which primarily share commercial messages, and only intermittent noncommercial messages are affected, the ordinance should be evaluated in the realm of commercial speech. But the Sign Code does not regulate noncommercial speech only intermittently. The regulation applies to any noncommercial message "off-premises" whether it is displayed for ten minutes or ten years.

The Eleventh Circuit dealt with a similar question in *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1269 n.15 (11th Cir. 2005). There, a city

---

commercial speech regulations—regardless of whether they regulate content. Therefore, the district court erred in applying *Central Hudson*'s test based on the law's content neutrality—both because this is a misapplication of *Central Hudson* and because, as we establish above, the law is not content neutral.

No. 19-50354

ordinance regulating signs applied to both commercial and noncommercial messages. The City argued that it nonetheless should be reviewed under the *Central Hudson* test because it regulates primarily commercial speech. *Id.* The Eleventh Circuit reasoned that because the sign code at issue did not regulate commercial speech as such, but rather applied "without distinction to signs bearing commercial and noncommercial messages," the *Central Hudson* test had no application and strict scrutiny applied. *Id.* [5]

Indeed, the Supreme Court has warned against parsing speech in order to apply the proper test. Where "the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected expression." *Riley*, 487 U.S. at 796.

---

[5] The City relies on *International Outdoor, Inc. v. City of Troy*, No. 17-10335, 2017 WL 2831702 (E.D. Mich. June 30, 2017), for the proposition that intermittent noncommercial speech does not take a regulation out of the realm of commercial speech. We find *City of Troy* both factually distinguishable and unpersuasive. First, *City of Troy* evaluated a variance, which meant it was evaluating the specific sign at issue: an electronic billboard that had 32 rotating messages, 31 of which were commercial. The Michigan district court determined that this was "intertwined" speech. *Id.* at *5. Because the billboards were going to carry mostly commercial messages, the court concluded that this "intertwined" speech was essentially commercial in nature. *Id.* (citing *Riley v. Nat. Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988); *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 441 (4th Cir. 1999)).

We do not speak on whether the billboard at issue in *City of Troy* was a proper example of "intertwined" speech, but do point out that the speech at issue (one out of 32 billboards sharing a commercial message) is considerably different than the two cases the district court relied on for support—*Kentucky Registry* and *Riley*. The sort of "intertwined" speech addressed in the cited cases did not involve the kind of discrete messages carried on billboards, where one speaker's message may be noncommercial and another speaker's message commercial. Here, the potential noncommercial messages are not intertwined with other commercial speech. Austin's regulation applies fully to a billboard that seeks to display only noncommercial messages on an off-premises billboard.

This logic also applies to parsing regulations. A regulation covering billboards is not exempt from strict scrutiny simply because most billboards display commercial messages. Here, the regulation applies with equal force to both commercial and noncommercial messages. For that reason, strict scrutiny applies. *See Solantic*, 410 F.3d at 1269 n.15 (explaining that because the sign code applies without distinction to signs bearing commercial and noncommercial messages, the *Central Hudson* test does not apply); *Southlake Prop. Assocs., Ltd. v. City of Morrow*, 112 F. 3d 1114, 1116–17 (11th Cir. 1997) (holding that to the extent that a sign ordinance regulates noncommercial speech, it must withstand a heightened level of scrutiny); *Cedar Park*, 387 F. Supp. 3d at 712–14 (noting that a law that applies to both commercial and noncommercial speech must survive strict scrutiny).

## C.

Having determined that the Sign Code is content based and that the commercial-speech exception does not apply, we assess the relevant provisions of the pre-amendment Sign Code under strict scrutiny. Under that standard, "the Government [must] prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. Strict scrutiny is, understandably, a hard standard to meet. *See Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015); *Reed*, 576 U.S. at 176 (Breyer, J., concurring) (explaining that strict scrutiny leads to almost certain legal condemnation). This is not one of those cases.

The City relied on the stated purpose of the Sign Code—to "protect the aesthetic value of the City and to protect public safety"—for justification of the ordinance. These were the same two justifications relied upon by the municipality in *Reed*. 576 U.S. at 171. As the Supreme Court held in *Reed*, we hold here that these purported justifications do not satisfy strict scrutiny. *See id.* at 172.

No. 19-50354

The City has not provided any argument that on-premises signs are a greater eyesore than off-premises signs, and the City cannot "plac[e] strict limits on" off-premises signs, as "necessary to beautify the [City] while at the same time allowing" on-premises signs of the same type. *Id.* The City has also failed to support its second stated justification: that off-premises digital signs pose a greater risk to public safety than on-premises digital signs. It has provided no evidence that on-premises signs pose less of a risk to public safety than off-premises signs.

Therefore, like the ordinance in *Reed*, the ordinance here is underinclusive. *See id.* at 171. A "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (quoting *Florida Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring in the judgment)). The City has failed to show that this ordinance is narrowly tailored to serve a compelling government interest. It therefore fails strict scrutiny.

## IV.

We hold that the on-premises/off-premises distinction is content based and fails under strict scrutiny. It thus runs afoul of the First Amendment. We REVERSE the district court's decision and REMAND to the district court for further proceedings consistent with this opinion.